**Otis L. SMITH, Plaintiff-Appellant,**

**v.**

**Paul DELO; Debbie Reed,
Defendants-Appellees.**

**No. 92–2991.**

United States Court of Appeals,
Eighth Circuit.

Submitted March 18, 1993.

Decided June 9, 1993.

Rehearing and Suggestion for Rehearing
En Banc Denied July 19, 1993.

Kenneth Burke, St. Louis, MO, argued, for appellant.

Tamara Medler, St. Louis, MO, argued, for appellee.

Before MORRIS SHEPPARD ARNOLD, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and KYLE,* District Judge.

FLOYD R. GIBSON, Senior Circuit Judge.

Smith appeals the district court's [1] grant of summary judgment against him in his challenge to certain prison mail regulations. We affirm.

## I. BACKGROUND

Smith has been an inmate in the Missouri Correctional System since 1983, and is currently incarcerated at the Potosi Correctional Center. Prior to 1989, all outgoing inmate mail addressed to members of the media or of the clergy was classified as privileged. This classification meant that the mail could be sent to the prison mailroom sealed. After February 1989, these categories of mail were reclassified as "not privileged," which meant that it had to be sent to the prison mailroom unsealed so it could be inspected for contraband and proper addressing.[2] Prison officials may read non-privileged mail to determine whether it contains threats (to either prison security or individuals) or evidence of illegal activity. Barring inclusion of these impermissible matters, the mail is not censored.

Smith filed suit, alleging the reclassification of clergy and media mail as nonprivileged violated his First Amendment rights. The defendants (hereinafter "the prison officials") moved for summary judgment. The magistrate judge initially denied the motion insofar as it applied to Smith's request for declaratory and injunctive relief, but granted the motion insofar as it applied to Smith's request for monetary damages based on the prison officials' qualified immunity. Upon reconsideration, the magistrate judge concluded the change in classification did not violate the First Amendment and granted the prison officials' motion for summary judgment. The district court adopted the magistrate judge's report and recommendation, and Smith appeals.

## II. DISCUSSION

### A. The Standard

■ "When analyzing actions that impinge upon prisoners' constitutional rights, we must steer between two well-established principles: on the one hand, prisoners do not lose all their constitutional rights while behind bars; on the other hand, federal courts must defer to the judgment of those officials responsible for the inordinately difficult task of operating a prison." *Quinn v. Nix*, 983 F.2d 115, 118 (8th Cir.1993). Typically, the decisions of prison officials are upheld so long as they are "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987). This examination focuses upon whether the regulation is rationally related to a legitimate and neutral objective, *Thornburgh v. Abbott*, 490 U.S. 401, 414, 109 S.Ct. 1874, 1882, 104 L.Ed.2d 459 (1989), whether alternative means for exercising the right exist, *id.* at 417, 109 S.Ct. at 1883, the impact accommodation of the right will have on others in the prison, *id.* at 418, 109 S.Ct. at 1884, and whether obvious, less-restrictive easy alternatives exist to the response taken by the officials. *Id.*

In arguing for a more exacting standard of review, Smith relies on *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). Smith insists that *Martinez*, which he interprets as establishing a "less restrictive means" test, applies to this case because both *Martinez* and this case (unlike *Turner* and *Abbott*) involved outgoing prisoner mail. We do not agree with Smith's interpretation of *Martinez*, particularly in light of the Supreme Court's discussion of that case in *Abbott*.

In *Martinez*, the Supreme Court struck down California prison regulations that at-

* The Honorable Richard H. Kyle, United States District Judge for the District of Minnesota, sitting by designation.

1. The Honorable Edward L. Filippine, Chief Judge of the United States District Court for the Eastern District of Missouri.

2. Currently, mail is considered privileged if it is addressed to or from judges, courts, elected government officials, prison officials, parole board members, or attorneys.

tempted to control the content of mail sent to recipients outside the prison. *Id.* at 399–400, 94 S.Ct. at 1805.[3] In discussing *Martinez,* the *Abbott* Court specifically stated that it did "not believe that *Martinez* should, or need, be read as subjecting the decisions of prison officials to a strict 'least restrictive means' test. As noted, *Martinez* required no more than that a challenged regulation be 'generally necessary' to a legitimate governmental interest. 416 U.S., at 414 [94 S.Ct. at 1811]." *Abbott,* 490 U.S. at 411, 109 S.Ct. at 1880. The Court went on to explain that "a careful reading of *Martinez* suggests that our rejection of the regulation at issue resulted not from a least restrictive means requirement, but from our recognition that the regulated activity centrally at issue in that case— outgoing personal correspondence from prisoners—did not, by its very nature, pose a serious threat to prison order and security." *Id.* (footnote omitted). Finally, the *Abbott* Court explained that the regulations in *Martinez* "were broader than 'generally necessary' to protect the interests at stake." *Id.* at 412, 109 S.Ct. at 1881.

It is true that *Abbott* also said that "the logic of [the] analyses in *Martinez* ... requires that *Martinez* be limited to regulations concerning outgoing correspondence." *Id.* at 413, 109 S.Ct. at 1881. However, the context of this statement indicates it refers to *Martinez'* conclusion that "[t]he implications of outgoing correspondence for prison security are of a categorically lesser magnitude than the implications of incoming materials." *Id.* The Court was making clear that it was not going to further carve out areas of relatively high or low risks to security, as it rejected all proposed distinctions between incoming mail from inmates and incoming mail from non-inmates. *Id.* In other words, *Martinez* is limited to outgoing correspon-

dence when deciding the degree of security risk involved; however, when read in conjunction with the Court's discussion in *Abbott* cited in the above paragraph, it appears that *Martinez* should not be understood as establishing a special test that applies only when evaluating the constitutionality of regulations governing outgoing mail. *Martinez* should be understood as striking down the regulation because it was not rationally related to a legitimate and neutral penological objective and because the regulation went further than necessary to serve valid governmental interests. This is not different from the analysis mandated by *Turner.* Consequently, we analyze the reclassification at issue in this case under the *Turner* standard.

## B. Application of *Turner*

 We start, as required by *Abbott,* by examining whether the regulation is rationally related to a legitimate and neutral objective. Through their affidavits and depositions, the prison officials explained that the prison had an interest in screening mail for escape plans, contraband, threats, or evidence of illegal activity. Although there is less of a security risk with outgoing mail precisely because the mail is going out of the prison, *Abbott,* 490 U.S. at 413, 109 S.Ct. at 1881, there is also no doubt that prison officials are justified in discovering and refusing to process mail that contains these matters. *Id.* at 412, 109 S.Ct. at 1880; *Martinez,* 416 U.S. at 412–13, 94 S.Ct. at 1881. This being the case, it is apparent that the regulation at issue is reasonably related to this legitimate purpose; only by discovering the contents of the mail can prison officials insure that mail containing improper matters is not sent outside the prison.[4]

---

3. The regulations prohibited the sending of letters that "unduly complain[ed]," "magnif[ied] grievances," "express[ed] inflammatory political, racial, religious or other views or beliefs," "contain foreign matter," or were "otherwise inappropriate." *Martinez,* 416 U.S. at 399 & n. 3, 400 & n. 4, 94 S.Ct. at 1804 & n. 3, 1805 & n. 4.

4. In the context of a prison, the First Amendment and the Sixth Amendment do not sit on an equal footing. Inmates retain virtually the same Sixth Amendment protections afforded to non-inmates.

However, inmates, precisely because they are incarcerated, necessarily surrender some (though not all) of their First Amendment rights. Thus, though the dissent properly recognizes that the procedures at issue might infringe the inmates' Sixth Amendment rights if they were applied to legal correspondence, this does not automatically render the procedures at issue invalid under the First Amendment when they are applied to media and clergy mail.

■ Determining whether alternative means for exercising the right asserted by the inmates exist is complicated by the difficulties in ascertaining the precise right that is asserted. If the right at issue is the right to communicate with the media and outside religious figures and institutions, there is no doubt that alternative means exist. The record reflects that inmates may use the phone to communicate with people outside the prison, and there is also an indication that, under certain circumstances, in-person meetings may be (and have been) arranged. Moreover, the challenged regulation does not bar communication via the mail; Smith is perfectly free to write to the media or the clergy about a wide range of subjects (including matters critical of the prison) without being censored. Recognizing this, Smith seems to argue there is no alternative means for exercising his right to *unmonitored* communication. We do not believe he has such a right. Certainly, constant monitoring of communications would be a problem of great constitutional dimension if we dealt with communications between non-inmates and the media or the clergy. However, there is no doubt, in light of both *Martinez* and *Abbott*, that prison officials have a legitimate interest in preventing inmates from communicating certain types of information.

■ Thirdly, we examine the impact on non-prisoners if the regulation were struck down. If this regulation, which represents the only method of identifying impermissible mail, were not allowed, mail containing threats, escape plans, etc. would be processed and delivered without the knowledge of prison officials. This has a tremendous impact on prison officials, who have a strong interest in preventing, deterring, and discovering escape plans. It also would have a strong impact on anyone receiving a threat from an inmate.

■ Smith finds much meaning in the fact that the prison officials could not identify an instance in which impermissible matters were included in media and clergy mail when those types of mail were treated as privileged. We do not find this factual allegation to be terribly important. First, neither of the defendants had anything to do with changing the classification, which change has effect over the entire Missouri prison system. The fact that no problems were encountered at Potosi does not mean Potosi should be exempt from an otherwise valid regulation. Second, and most importantly, prison officials do not need to wait for problems to occur before addressing them; prison officials are entitled to act preemptively in order to prevent problems from occurring in the first place. *See Martinez,* 416 U.S. at 404–05, 94 S.Ct. at 1807.

■ Finally, we examine available alternatives to the regulation. Smith argues that the prison can (as it had in the past) maintain a list of media outlets and their addresses and allow mail addressed to the outlets to be sent to the mailroom sealed. The premise upon which Smith bases the efficacy of this procedure is that pre-identified media outlets would not be likely to facilitate escape plans, would not forward threatening letters, and would report to the prison authorities any illegal activity or contraband contained in mail sent by inmates. *Cf. Burton v. Foltz,* 599 F.Supp. 114, 116 (E.D.Mich.1984). However, the prison officials contend the making of such a list is not as easy as it seems. First, there would be a great deal of difficulty in identifying "the media." Obviously, ABC News and the *St. Louis Post–Dispatch* would be included on the list. However, more problematic entities exist; for instance, would an extremist group's newsletter have to be included? If so, the prison's interests may be seriously undermined; the list would not necessarily enable the prison to satisfy its constitutionally-permissible objective of insuring that illegitimate communication is not sent out of the prison and acted upon by outsiders. If such groups could be excluded, the prison would face an impossible task in formulating the list as it struggled to determine which groups could be properly excluded, and by which standard such determinations would be made. These barriers convince us that the Constitution does not require the prison to maintain a list of members of the media to which inmates may send

sealed mail.[5]

■ Smith, recognizing the problems inherent in deciding who should and should not be included on a list, suggests the prison officials can meet their constitutional obligations by making a list of, for instance, twenty-five media outlets. We do not find this solution availing. First, Smith either has or does not have a right to unmonitored communication with the media; the Constitution would not grant him a right to unmonitored communication with only twenty-five members of the media. Second, a limited list does not avoid the problems we have recounted; problems would undoubtedly arise over who should be included and excluded from the list.[6]

## III. CONCLUSION

The regulation requiring media and clergy mail to be sent to the prison mailroom unsealed is rationally related to the prison officials' legitimate interest in preventing and discovering mail that contains contraband, threats, evidence of escape plans and other illicit activity. The regulation does not prohibit inmates from communicating any permissible message, even those that might be unflattering to the prison. There also does not appear to be a less-restrictive manner by which the officials can vindicate their interests. Accordingly, we affirm the district court.

MORRIS SHEPPARD ARNOLD, dissenting.

I respectfully dissent. *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), as limited by *Thornburgh v. Abbott*, 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989), controls this case and requires us to hold that the Missouri prison mail regulations are unconstitutional. While

*Martinez* does not impose a "least restrictive means" test on prison regulation of outgoing mail, it does require that a regulation's "limitation of [inmates'] First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved." *Martinez*, 416 U.S. at 413, 94 S.Ct. at 1811. In other words, it requires that the challenged regulation be "generally necessary" to a legitimate government interest. *Thornburgh v. Abbott*, 490 U.S. at 411, 109 S.Ct. at 1880 (citing *Martinez*, 416 U.S. at 414, 94 S.Ct. at 1811).

The defendants here maintain that the regulations were imposed in the interest of prison security. The *Abbott* Court, however, observed that outgoing prisoner mail does "not pose, by its very nature, a serious threat to prison order and security." 490 U.S. at 411, 109 S.Ct. at 1880. Defendants have presented nothing to indicate that the situation within their prison system is materially different from that assessed in *Abbott*. They make only general assertions that prisoners will use any means possible to breach prison security, a proposition that we may admit without necessarily approving the means to which they have resorted to ensure prison security.

The Missouri regulation is similar to those that have been upheld when used to screen incoming mail, which is considered a much greater threat to prison security. *See, e.g., Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) (upholding prison regulation disallowing mail between inmates except that between immediate family members who are inmates at different institutions); *Abbott*, 490 U.S. 401, 109 S.Ct. 1874 (upholding prison regulation allowing warden to reject any publication ordered by inmate if the publication is detrimental to security, good order, or discipline, or if it might facili-

---

**5.** At oral argument, Smith's counsel seemed to waver on whether the prison officials had a duty to maintain a list of religious groups to which inmates could send inmate mail. We believe everything we have said about the media applies equally well to this context. Additionally, we note prison officials would face an additional burden with regard to religious groups because prison officials cannot enact mail regulations that discriminate on the basis of religion. *Val-*

*iant–Bey v. Morris*, 829 F.2d 1441, 1444 (8th Cir.1987).

**6.** Smith also argues that the prison officials' jobs were easier when media and clergy mail were privileged. This is irrelevant to our constitutional discussion. Very often, security measures are onerous and impose burdens on those responsible for implementing them; this does not mean they should not be implemented.

tate criminal activity). The same type of regulation considered generally necessary to screen incoming mail can hardly be considered generally necessary to screen outgoing mail because the former admittedly poses a far greater threat to prison security than does the latter. A regulation commensurate with the lesser threat to security might include mailroom verification that an addressee of sealed correspondence is a member of the staff of a legitimate media or religious organization (just as they do now with correspondence to attorneys, judges, and other privileged legal addressees). Such a regulation would eliminate the inevitable chilling effect that the current restriction has on inmates' exercise of their First Amendment rights.

At bottom, my disagreement with the court has to do with my inability to perceive any juridical distinction between the safeguards required to protect the First Amendment rights asserted here and those required to safeguard the rights secured by the Sixth Amendment.

I would therefore reverse.