Robert Daniel GASSLER; James Leroy Scott, Plaintiffs–Appellants,

v.

Frank W. WOOD; Steve Lydon; Walter Sass, Defendants–Appellees.

No. 92–2682.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 13, 1993.

Decided Jan. 20, 1994.

---

Heidi H. Crissey, Minneapolis, MN, argued (John R. Wylde, on the brief), for plaintiffs-appellants.

Blair Allen Rosenthal, Asst. Atty. Gen., St. Paul, MN, argued (M. Jacqueline Regis, on the brief), for defendants-appellees.

Before LOKEN, Circuit Judge, CAMPBELL, Senior Circuit Judge,* and HANSEN, Circuit Judge.

LEVIN H. CAMPBELL, Senior Circuit Judge.

Robert Daniel Gassler and James Leroy Scott, plaintiffs-appellants, were both incarcerated at the Minnesota Correctional Facility at Oak Park Heights (MCF–OPH) when, on June 11, 1991, they initiated a *pro se* action pursuant to 42 U.S.C. § 1983 in the

United States District Court for the District of Minnesota,[1] seeking injunctive, declaratory, and monetary relief from three MCF–OPH officials, Frank Wood, Steve Lydon, and Walter Sass, defendants-appellees. In their nine-count complaint, Gassler and Scott claimed, *inter alia*, that the defendants had violated their First and Fourteenth Amendment rights by providing a third party with photocopies of their nonlegal mail. On June 15, 1992, the district court awarded summary judgment in the defendants' favor on all counts except a state law count, which it dismissed without prejudice. *See Gassler et al. v. Wood et al.*, No. 4–91–450 (D.Minn. 1992). Gassler and Scott filed a timely notice of appeal. We affirm.

## I.

On February 8, 1991, while Gassler and Scott were incarcerated at MCF–OPH,[2] a Todd County, Minnesota, grand jury indicted them for premeditated first degree murder, intentional second degree murder, and second degree murder while committing a felony in connection with the death of Dale William Yungk. Ricky Lowen, special agent for the Minnesota Bureau of Criminal Apprehension (BCA), was the chief investigator in the criminal charges brought against the appellants.

In an affidavit, Agent Lowen stated that in the course of his investigation he had "received information from several sources that Gassler and Scott were trying to intimidate and, in some cases, kill prosecution witnesses who would testify against them in their upcoming criminal trials." Believing that Gassler and Scott were indeed willing to harm or threaten prosecution witnesses who would testify against them and that they had contacts outside of MCF–OPH who were in a position to carry out their requests,[3] Agent

---

\* The HONORABLE LEVIN H. CAMPBELL, Senior United States Circuit Judge for the First Circuit, sitting by designation.

1. The Honorable James M. Rosenbaum, District Judge, United States District Court for the District of Minnesota.

2. Scott is serving a 125–month sentence for kidnapping and first degree assault as well as a consecutive life sentence for first degree murder.

Gassler is serving a 145–month sentence for aggravated robbery and forgery. In June of 1992, Gassler was transferred to a federal facility in Oxford, Wisconsin.

3. Agent Lowen stated in his affidavit that he was "familiar with [the appellants'] extensive criminal histories, in which both [men] had committed numerous crimes of violence against individuals whom they perceived as threats to the success of their plan."

Lowen said that he contacted Steve Lydon, Internal Affairs Liaison at MCF–OPH, on or about April 30, 1991, and asked that Gassler and Scott be separated if they were living next to one another. Lydon agreed to separate them.[4] Lydon also informed Agent Lowen that he (Lydon) could obtain authority to read Gassler's and Scott's nonlegal correspondence, and offered to provide Agent Lowen with photocopies of the correspondence. Believing that Gassler and Scott might use the mail in connection with plans to intimidate and harm prospective witnesses, Agent Lowen accepted Lydon's offer to furnish him with photocopies.

Lydon thereupon secured authorization from Frank Wood, who was Warden of MCF–OPH at that time, to monitor appellants' nonlegal correspondence and began to do so. Lydon would only skim the mail, after which he photocopied it and delivered the copies to Agent Lowen. Notwithstanding these practices, appellants' incoming nonlegal correspondence was delivered to Gassler and Scott and their outgoing correspondence was sent on to addressees.

## II.

On appeal, Gassler and Scott do not argue that appellees abridged any of their constitutional or legal rights by providing Agent Lowen with photocopies of their *incoming* nonlegal mail. Nor do they contend that providing Agent Lowen with copies of their *outgoing* nonlegal mail violated constitutional or legal rights other than free speech interests under the First Amendment. Gassler and Scott concede, moreover, that "appellees [prison authorities] were within their rights to monitor [their] outgoing nonlegal correspondence."[5] Hence, the only issues on appeal are (1) whether the appellees trenched upon First Amendment free speech rights by delivering to Agent Lowen photocopies of Gassler's and Scott's *outgoing* nonlegal mail and, if so, (2) whether such an infringement was justifiable under these circumstances.

In *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), the United States Supreme Court "reasoned that it was unnecessary to determine to what extent prisoners retained First Amendment freedoms ... since free citizens have a protected First Amendment right to communicate with prisoners through uncensored correspondence, whether as an author or as an intended mail recipient." *Martin v. Kelley*, 803 F.2d 236, 240 (6th Cir.1986) (citing *Martinez*, 416 U.S. at 408–09, 94 S.Ct. at 1809). In *Martinez*, prison authorities not only read but also censored the prisoners' mail. The Court held that censorship was permissible only to the extent prison officials could show that it "furthers one or more of the substantial [state] interests of security, order, and rehabilitation." *Martinez*, 416 U.S. at 413, 94 S.Ct. at 1811. Otherwise, such censorship impermissibly restrains First Amendment rights.

In the present case, unlike in *Martinez*, there was no censorship or other direct restraint. All of Gassler's and Scott's incoming mail was delivered to them uncensored, and their uncensored outgoing mail was sent along to its intended recipients. If Gassler's and Scott's First Amendment communicative rights were abridged at all, it would be because of the deterrent or "chilling" effect

---

**4.** Following his conversation with Agent Lowen, Lydon directed Lt. Walter Sass, the officer in charge of the MCF–OPH Segregation Complex, to move Gassler and Scott into different defendable living units.

**5.** Several circuits, including ours, have held that prison officials do not commit constitutional violations by reading prisoners' outgoing nonprivileged mail. *See, e.g., Smith v. Delo*, 995 F.2d 827, 830 (8th Cir.1993) (holding that prison officials are justified in screening outgoing nonlegal mail for escape plans, contraband, threats, or evidence of illegal activity); *Stow v. Grimaldi*, 993 F.2d 1002, 1004–05 (1st Cir.1993) (holding that a New Hampshire State Prison practice of requiring nonprivileged outgoing mail to be submitted for inspection in unsealed envelopes does not violate prisoners' constitutional rights); *United States v. Whalen*, 940 F.2d 1027, 1035 (7th Cir.) (holding that "it is well established that prisons have sound reasons for reading the outgoing mail of their inmates"), *cert. denied,* —— U.S. ——, 112 S.Ct. 403, 116 L.Ed.2d 352 (1991); *United States v. Kelton*, 791 F.2d 101, 103 (8th Cir.) (prisoner's Fourth Amendment rights were not violated when prison official inspected and copied prisoner's outgoing mail), *cert. denied,* 479 U.S. 989, 107 S.Ct. 583, 93 L.Ed.2d 586 (1986).

upon free expression caused by the authorities' opening and examination of appellants' mail, including transmittal of photocopies to Agent Lowen for his further examination. *See Laird v. Tatum,* 408 U.S. 1, 11, 92 S.Ct. 2318, 2324, 33 L.Ed.2d 154 (1972). Appellants concede, however, that prison authorities themselves were constitutionally entitled to open and examine their outgoing nonlegal mail. The only question left, therefore, is whether the sending of photocopies of the outgoing mail to Agent Lowen violated appellants' First Amendment rights. We think the answer is plainly no.

Had the authorities improperly shared appellants' outgoing mail with unauthorized persons—for example, with a newspaper reporter or a prisoner's business rival—the situation might be different. *Cf. Trudeau v. Wyrick,* 713 F.2d 1360 (8th Cir.1983) (warden violated lay associate minister's First Amendment rights by intercepting incoming letter addressed to inmate and forwarding the letter to the chancellor of the Diocese of Fort Worth, Texas). But where the correspondence was simply being sent to another law enforcement officer so that he could examine it with the same security objectives in mind as justified examination by the prison authorities, we see no material enlargement of whatever "chill" on prisoner communication already existed by dint of the authorities' uncontroverted right to examine. Agent Lowen, no less than Lydon, was looking at this mail in the line of duty to see if it revealed plans to intimidate or murder witnesses in the upcoming trial. Agent Lowen's additional set of official eyes did not deter or chill appellants, or those receiving their letters, any more than had already occurred as a result of the prison authorities' opening of the letters. Accordingly, appellants' First Amendment rights, and those of their addressees, were not further diminished.

Even, however, if letting Agent Lowen see the correspondence was a separate and greater intrusion upon First Amendment rights, appellees should still prevail. Restraints on inmate correspondence are justified in furtherance of "the legitimate governmental interest in the order and security of penal institutions." *Martinez,* 416 U.S. at 412–13, 94 S.Ct. at 1811. The Supreme Court went on to say in *Martinez* that "[p]erhaps the most obvious example of justifiable censorship of prisoner mail would be refusal to send or deliver letters concerning escape plans *or containing other information concerning proposed criminal activity, whether within or without the prison.*" *Id.* at 413, 94 S.Ct. at 1811 (emphasis supplied). Reading prisoners' mail, as was done here, for suspected information concerning plans to intimidate or murder witnesses in an upcoming criminal trial fits well within the state's interest as identified by the Supreme Court in *Martinez.*

To be sure, the *Martinez* Court indicated that "the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the governmental interest involved." *Id.* But the Court also stated that prison administrators need not "show with certainty that adverse consequences would flow from failure to censor a particular letter. Some latitude ... is essential to the proper discharge of an administrator's duty." *Id.* at 414, 94 S.Ct. at 1812.

Here, nothing was done to interfere with appellants' correspondence other than reading it with the aid of the specially knowledgeable investigator, Agent Lowen. Appellants argue that the prison officials went too far in allowing Agent Lowen to see the outgoing correspondence, as his examination was not proven to be "necessary or essential" within *Martinez.* In appellants' view, the prison liaison officer, Lydon, could have adequately detected any references in the correspondence to witness intimidation or murder. Agent Lowen, however, was positioned to read the letters in the context of his detailed knowledge of appellants' outside activities and connections. Particular words, names, or phrases might have conveyed some meaning to Agent Lowen that would have been lost upon Lydon. Given the very serious nature of the suspected conduct, it was a sensible and justifiable precaution for the authorities to let Agent Lowen see the letters. Even under a strict and literal reading of *Martinez,* and without reference to other

cases,[6] we have no doubt that prison officials were entitled to enlist Agent Lowen's expertise in screening the letters for the purpose of ascertaining whether appellants were engaging in the type of criminal activity that Agent Lowen feared.

*Affirmed.*

---

6. *E.g. Thornburgh v. Abbott,* 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989); *Smith v. Delo,* 995 F.2d 827 (8th Cir.1993). We need not discuss appellants' attempted distinction between regulating outgoing mail, said to require a stricter standard of necessity, and regulating incoming mail, said to involve a somewhat lesser standard. In *Smith,* 995 F.2d at 830, this circuit rejected such a distinction, and we, of course, are bound

by stare decisis to that result. But even were appellants' distinction to have merit, it would have no effect on the outcome here, as under any standard we would affirm the judgment below. Appellants' reliance on *Trudeau v. Wyrick,* 713 F.2d 1360 (8th Cir.1983) is misplaced, the facts of that case being completely distinguishable.