Larry E. **PACKETT**, Plaintiff,

v.

Harold W. **CLARKE**, Robert P. Houston, and Kathleen A. Smith, Defendants.

No. 4:CV94–3339.

United States District Court, D. Nebraska.

Jan. 11, 1996.

Susan Kubert Sapp, Cline, Williams, Wright, Johnson & Oldfather, Lincoln, NE, for Plaintiff.

Don Stenberg, Attorney General, Melanie J. Whittamore–Mantzios, Assistant Attorney General, Lincoln, NE, for Defendants.

## MEMORANDUM AND ORDER

KOPF, District Judge.

Plaintiff Larry Packett, an inmate at the Lincoln Correctional Center in Lincoln, Nebraska, alleges that Defendants violated his First Amendment rights and 42 U.S.C. § 1983 when a catalog entitled *The Edge Company,* which was addressed to Packett, was delivered to the LCC mailroom, but not delivered to Packett because the publication was deemed a "[t]hreat to the saf[et]y, security and good order of the institution." (Filing 31, Pl.'s Evidence, Ex. 2; Filing 19, Amended Complaint ¶¶ 1, 5.) Plaintiff sues each defendant in his or her individual and official capacities and requests $200 from each defendant, compensatory damages of $3.00, a permanent injunction prohibiting Defendants from denying delivery of *The Edge Company* to Plaintiff while he is incarcerated with the Nebraska Department of Correctional Services, attorney fees, and costs. (Filing 19 at 4, 5.)

Pending before the court are the parties' cross-motions for summary judgment (filing 26, Defendants' motion; filing 30, Plaintiff's motion) and the evidence submitted in support of these motions (filing 27, Defendants' evidence; filing 31, Plaintiff's evidence). After considering the parties' evidence and briefs in support of their motions for summary judgment, I find the undisputed material facts to be as follows.

## I. UNDISPUTED MATERIAL FACTS

1. At all times relevant to this action, plaintiff Larry E. Packett was, and is, an inmate at the Lincoln Correctional Center (LCC) in Lincoln, Nebraska. (Filing 31, Ex. 1 ¶ 1.)

2. At all times relevant to this action, defendant Harold W. Clarke was, and is, Director of the Nebraska Department of Correctional Services (DCS). (Filing 27, Ex. 3 ¶ 1.)

3. At all times relevant to this action, defendant Robert P. Houston was, and is, the warden of LCC, a maximum custody correctional facility in which Plaintiff resides. (Filing 27, Ex. 2 ¶¶ 1, 2.)

4. At all times relevant to this action, defendant Kathleen A. Smith was, and is, a mailroom supervisor at LCC. Smith's duties include supervision and administration of the mailroom and mail distribution process at LCC. Smith does not make policy or formulate rules and regulations pertaining to the type or content of publications that are considered contraband, but is instead required to act in accordance with DCS and LCC rules and regulations, as well as directives issued by the LCC warden and DCS director. (Filing 27, Ex. 1 ¶¶ 1–3.) When the chief executive officer of an institution classifies a piece of incoming mail as contraband, the LCC mailroom staff is prohibited from distributing such contraband to the inmate. (Filing 27, Ex. 1 ¶ 4.) When a publication is classified as contraband and not delivered to an inmate, the inmate is permitted to grieve the disposition of the publication. (*Id.*)

5. On June 16, 1994, the LCC mailroom received a publication entitled *The Edge Company,* which was addressed to Plaintiff. (Filing 27, Ex. 1 ¶ 6.) *The Edge Company* is a catalog containing "knives, tools, & gifts for modern man." (Filing 27, Ex. 2C at 1.) Besides featuring a myriad of knives and swords for sale, *The Edge Company* catalog includes what I would characterize as Maxwell Smart-like items such as lock-picking

instruments, each accompanied by a publication entitled "Secrets of Lock Picking" (*id.* at 2, 6, 20); revolvers (*id.* at 4) and assault rifles (*id.* at 31); a watch that "looks like no more than an innocent wristband," but spews tear gas and OC pepper with the click of a finger (*id.* at 5); a pair of pliers that conceals blades in its handle (*id.* at 8); umbrellas and canes containing hidden blades ranging from five to 21 inches (*id.* at 17, 21, 53, 56); instruments resembling ball-point pens "[i]nnocently riding in your pocket," but actually concealing three-inch "javelin edge[s] of high carbon steel" or operating as a laser (*id.* at 25, 28, 41); leg irons with double-slotted keys (*id.* at 43); and a hair brush which contains a hidden four-inch double-edged blade (*id.* at 46).

6. After studying the contents of *The Edge Company,* defendant Smith instructed a mailroom clerk to send a Notice of Returned Mail to Plaintiff, informing Plaintiff that he would not be allowed to receive the publication because it posed a threat to the safety, security, and good order of the institution, and that Plaintiff could file a grievance concerning the denial of the publication. (Filing 27, Ex. 1 ¶ 6; Filing 31, Ex. 2.)

7. On June 17, 1994, Plaintiff filed a Step One Grievance with defendant Houston regarding defendant Smith's failure to deliver *The Edge Company* to Plaintiff. (Filing 31, Ex. 1 ¶ 3; Filing 27, Ex. 2B.) Defendant Houston responded to the grievance on June 23, 1994, stating that he agreed with Smith's actions and that the publication's "primary information is about weapons and will not be permitted into this facility." (Filing 27, Ex. 2B.)

8. On June 29, 1994, Plaintiff filed a Step Two Grievance appealing the denial of delivery of *The Edge Company.* (Filing 31, Ex. 1 ¶ 5; Filing 27, Ex. 3C.) Pursuant to defendant Harold Clarke's delegation of responsibility, Dave Avery, Superintendent of LCC, responded to Plaintiff's grievance on July 8, 1994. (Filing 27, Ex. 3 ¶ 6.) Avery responded that he agreed with defendant Houston's previous response because *The Edge Company* was a catalog of weapons, "any of which would be a security threat in the institution, and many of which could be fabricated or copied by an inventive inmate." (Filing 27, Ex. 3C.)

9. Pursuant to Neb.Rev.Stat. § 83–173 (Reissue 1994), the Director of DCS is authorized to adopt rules and regulations for the management, correctional treatment, and rehabilitation of persons committed to DCS. DCS develops "Administrative Regulations" (AR) which are provided to various correctional institutions that are required to implement them. The policy statements contained in these AR's are then implemented through each institution's "Operational Memoranda" (OM). (Filing 27, Ex. 3 ¶ 4.)

10. Title 68, Chapter 3, of DCS regulations provides that any printed, published, or photographed materials which are deemed by the chief executive officer of a facility to constitute "a threat to the safety, security, or good order of the facility" are contraband which may be confiscated. (Filing 27, Ex. 3A §§ 003, 003.02B.) AR 205.1(F) provides that the chief executive officer of each correctional facility within DCS shall issue guidelines which define the types of mail which will be considered a "threat to the safety, security, or good order of that facility." (Filing 27, Ex. 3B ¶ F.) LCC OM 205.1.2.1(IV)(A)(2)(d) defines as "contraband" any "printed, published, or photographed materials which are deemed by the Warden to constitute a threat to the safety, security, or good order of the facility," and section 205.1.2.1(IV)(A)(1)(b) designates "[p]lans for the introduction and/or manufacture of weapons" as contraband. (Filing 27, Ex. 2A at 1.)

11. Referring to the numerous weapons concealed in everyday items such as hair brushes, pens, and umbrellas which are marketed and pictured in *The Edge Company,* defendant Houston believes that delivery of *The Edge Company* to inmates such as Plaintiff threatens the safety, security, and good order of LCC due to the threat that an inmate may order and receive a concealed weapon which would escape the notice of prison personnel charged with inspecting incoming mail, and because inmates may attempt to reproduce the weapons depicted in the publication. (Filing 27, Ex. 2 ¶ 7.)

12. During Houston's tenure at LCC and other DCS facilities, he has found inmates to be "very inventive when it comes to manufacturing weapons." (*Id.* ¶ 8.)

In fact[,] an inmate was killed at LCC two years ago by a knife fashioned by an inmate within LCC. Inmates have used many ordinary items to fashion knives. Inmates have used rolled[-]up magazines for the handle of a knife and other instruments for the blade, such as pencils, pens, razor blades, and metal from the shops and work areas at LCC. A knife catalogue that depicts various knives, including concealed knives, for the inmates to copy its contents poses a direct threat to a maximum security prison.

(*Id.*) As mentioned above, *The Edge Company* also contains photographs of handcuffs, leg irons, and keys to unlock these items.

While this photograph may seem innocuous to the free world persons, I believe it poses a threat to the safety and security of the staff and inmates of LCC. ·Hand cuffs and leg irons are used to secure inmates when they travel in the community. An inmate could study the detail in photographs of the handcuffs, leg irons, and keys to the same, and fashion a device to unlock handcuffs and leg irons and cause injury to the general public or LCC staff escorting him and escape and/or assault a person(s).

(*Id.* ¶ 9.)

13. Defendant Clarke also believes distribution of *The Edge Company* to Plaintiff poses a threat to the security, safety, and good order of LCC for the following reasons:

A. It gives inmates ideas on how to manufacture weapons, keys to handcuffs and leg irons, and lock picks. During the time that I have worked for DCS I have learned of inmates fashioning weapons from ordinary items such as pens, pencils, plastic material, scrap metal from the shop, wood, soap, socks, spoons, forks, and soup ladles. Given the fact that LCC is a secured facility, it does not make sense to allow inmates to receive catalogues that offer lock picks and keys to handcuffs and leg irons.

B. It gives inmates ideas on how to conceal weapons, as there are at least five photographs in Exhibit 2C that depict weapons hidden in everyday items, such as pens, umbrellas, shafts, combs, and crosses. In addition to the threat of inmates manufacturing similar concealed weapons, is the threat that an inmate could order one of these items, and unknowing mail room staff may allow an inmate to have it without knowing that there is a concealed weapon.

C. An inmate could potentially have a friend order a weapon, lock picks, or the keys to handcuffs and leg irons from *The Edge Company* and have the friend smuggle the weapon, keys to handcuffs or leg irons, and lock picks into him during visiting hours. Staff are not allowed to perform an obtrusive search on an inmate's visitor without probable cause. Some of the weapons, keys to handcuffs or leg irons, and lock picks depicted in Exhibit 2C are quite small and would be easy to conceal.

(Filing 27, Ex. 3 ¶ 7.)

## II. LAW

Summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

█ When analyzing actions of prison personnel that impinge upon a prisoner's constitutional rights, " 'we must steer between two well-established principles: on the one hand, prisoners do not lose all their constitutional rights while behind bars; on the other hand, federal courts must defer to the judgment of those officials responsible for the inordinately difficult task of operating a prison.' " *Smith v. Delo,* 995 F.2d 827, 829 (8th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 710, 126 L.Ed.2d 676 (1994) (quoting *Quinn v. Nix,* 983 F.2d 115, 118 (8th Cir.1993)).

█ The decisions of prison officials are typically upheld as long as the decision at issue is " 'reasonably related to legitimate penological interests.' " *Id.* (quoting *Turner*

*v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987)). The following factors are relevant to this "reasonableness" inquiry: (1) whether the regulation is rationally related to a legitimate, neutral objective; (2) whether there are alternative means for exercising the constitutional right at issue; (3) the impact accommodation of the asserted constitutional right will have on others, such as guards and inmates, in the prison; and (4) whether obvious, easy alternatives exist to the response taken by the prison officials. *Thornburgh v. Abbott,* 490 U.S. 401, 414–418, 109 S.Ct. 1874, 1882–84, 104 L.Ed.2d 459 (1989) (challenge to regulation and application of regulation which allowed prisoners to receive publications from outside the prison, but authorized prison officials to reject publications which were detrimental to institutional security); *Turner v. Safley,* 482 U.S. 78, 89–91, 107 S.Ct. 2254, 2261–63, 96 L.Ed.2d 64 (1987) (challenge to regulation relating to correspondence between inmates at different institutions); *Smith v. Delo,* 995 F.2d at 829 (challenge to prison's classification of outgoing clergy and media mail as nonprivileged, thereby allowing it to be read by prison officials for threats or evidence of illegal activity); *Dawson v. Scurr,* 986 F.2d 257, 260 (8th Cir.), *cert. denied sub nom., Shearon v. Lynch,* —— U.S. ——, 114 S.Ct. 232, 126 L.Ed.2d 187 (1993) (challenge to prison regulation regarding the right of inmates to possess certain sexually explicit material in their cells).

Plaintiff in this case does not allege that any particular DCS regulation or LCC operational memorandum is facially unconstitutional (filing 19, Amended Complaint), but argues that DCS's and LCC's policy of prohibiting prisoners from receiving incoming mail which is deemed "a threat to the safety, security, or good order of the facility" (filing 27, DCS Regulations, Ex. 3A §§ 002 & 003), as applied to the defendants' refusal to distribute *The Edge Company* to Plaintiff, is not reasonable under the four factors outlined above. (Filing 19, Amended Complaint, at 3–5.)

## A. *Rational Relationship to Legitimate, Neutral Objective*

■ As was the case in *Thornburgh v. Abbott,* 490 U.S. at 415, 109 S.Ct. at 1882–83, the legitimacy of the DCS's purpose in promulgating, and applying to Plaintiff, the policy of prohibiting prisoners from receiving incoming mail which is deemed to be a threat to the safety, security, or good order of the facility is beyond question. This policy, and its application to Plaintiff, is "expressly aimed at protecting prison security, a purpose [the United States Supreme Court] has said is 'central to all other corrections goals.'" *Id.* (quoting *Pell v. Procunier,* 417 U.S. 817, 823, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974)). As stated by defendants Clarke and Houston, distribution of *The Edge Company* to inmates may well give the inmates ideas on how to conceal weapons, as *The Edge Company* is full of illustrations depicting weapons hidden in everyday items, such as pens, umbrellas, canes, brushes, watches, and tools. In addition to the threat of inmates manufacturing similar concealed weapons is the threat that an inmate could order one of these ordinary-looking items, and unknowing mailroom staff may allow an inmate receive the item without discovering the concealed weapon. (Filing 27, Ex. 2 ¶ 7 & Ex. 3 ¶ 7 (security concerns explained in detail by defendants Houston and Clarke).)

■ Further, the application of this policy to Plaintiff was neutral—that is, unrelated to the suppression of the particular expression contained in *The Edge Company.* Although Defendants were necessarily required to observe the content of *The Edge Company* in order to determine whether the publication constituted a security threat to LCC, "[w]here, as here, prison administrators draw distinctions between publications solely on the basis of their potential implications for prison security, the regulations are 'neutral' in the technical sense in which [the United States Supreme Court] meant and used that term in *Turner.*" *Thornburgh,* 490 U.S. at 415–16, 109 S.Ct. at 1883. *See also Dawson v. Scurr,* 986 F.2d at 261.

■ I conclude that the policy at issue is reasonably related to the legitimate, neutral objective of prison security discussed above. Keeping in mind that although *The Edge Company* was ordered by Plaintiff and was

to be delivered directly to Plaintiff, "[o]nce in the prison, material of this kind reasonably may be expected to circulate among prisoners, with the concomitant potential for coordinated disruptive conduct." *Thornburgh*, 490 U.S. at 412, 109 S.Ct. at 1881. While it may not be likely that all inmates who view *The Edge Company* will be spurred to construct the concealed weapons featured in that publication and unite in violence with their newly created devices, it is rational for DCS "to exclude materials that, although not necessarily 'likely' to lead to violence, are determined by the warden to create an intolerable risk of disorder under the conditions of a particular prison at a particular time." *Thornburgh*, 490 U.S. at 417, 109 S.Ct. at 1883.

### B. Alternative Means for Exercising Constitutional Right

■ Viewing Plaintiff's First Amendment rights "sensibly and expansively," *Thornburgh*, 490 U.S. at 417, 109 S.Ct. at 1884, I conclude that despite Defendants' application of the regulation at issue to Plaintiff, Plaintiff and other inmates at LCC still have available to them alternative means of exercising that right. DCS regulations and LCC OM's simply prohibit an inmate's receipt of contraband publications, as defined by those regulations. (Filing 27, Exs. 2A, 3A.) The definition of contraband publications contained in those regulations still "permit a broad range of publications to be sent, received, and read," thereby allowing Plaintiff and other inmates alternative means of exercising their First Amendment rights. *Thornburgh*, 490 U.S. at 418, 109 S.Ct. at 1884.

### C. Impact of Accommodation of Constitutional Right on Others in the Prison

■ Accommodating Plaintiff's desire to receive *The Edge Company* creates the likelihood that such material will circulate among many inmates within the prison, creating the "potential for coordinated disruptive conduct," *Thornburgh*, 490 U.S. at 412, 109 S.Ct. at 1881, should any of these inmates decide to create the weapons disguised as everyday items shown in *The Edge Company*. This potential for violence would obviously have a

significant, and possibly life-threatening, effect on prison officials who have a paramount interest in preventing and deterring violence by inmates, *Smith v. Delo*, 995 F.2d at 831, and in preserving the security and safety of themselves and the public. Where the right in question can be exercised only at the cost of significantly less safety for prison personnel and other inmates, "the courts should defer to the 'informed discretion of corrections officials.' " *Thornburgh*, 490 U.S. at 418, 109 S.Ct. at 1884 (quoting *Turner*, 482 U.S. at 90, 107 S.Ct. at 2262).

### D. Obvious, Easy Alternatives to Prison Officials' Actions

■ [T]he existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an "exaggerated response" to prison concerns. This is not a "least restrictive alternative" test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint. But if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard.
*Turner*, 482 U.S. at 90–91, 107 S.Ct. at 2262 (citation omitted).

■ Plaintiff suggests two alternatives which would allow Plaintiff to exercise his First Amendment rights: (1) LCC could restrict Plaintiff from obtaining any items from *The Edge Company* while he is incarcerated; and (2) LCC could limit the area in which the catalog may be read in order to limit circulation of the catalog among other inmates. (Br.Opp'n Defs.' Mot.Summ.J. & Supp.Pl.'s Mot.Summ.J. at 10–11.)

■ Neither of Plaintiff's suggested alternatives protect the main penological interest at issue here—prison security and safety. Restricting the placement of catalog orders and confining inmates to a certain room to read *The Edge Company* do not prevent the risk of disorder caused by inmates who view the catalog and are inspired to create weapons concealed in everyday items, as promi-

nently featured in the catalog. While Plaintiff alleges that he has neither fabricated nor reproduced weapons he has viewed in magazines, newspapers, and television, nor has he become aware of any other prisoners doing so (filing 31, ex. 1 ¶¶ 9, 10), "prison officials do not need to wait for problems to occur before addressing them; prison officials are entitled to act preemptively in order to prevent problems from occurring in the first place." *Smith v. Delo*, 995 F.2d at 831.

While Plaintiff's suggested alternatives would fully accommodate the plaintiff's rights, such accommodation would not be at *de minimis* cost to valid penological interests.

### III. CONCLUSION

Based on the above undisputed material facts and the four factors which are relevant to the "reasonableness" inquiry, the defendants' policy, and its application to Plaintiff, is "reasonably related to legitimate penological interests," *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987), and Defendants are therefore entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c).

Because I have resolved the parties' cross-motions for summary judgment (filings 26, 30) on the merits, I need not address Defendants' qualified immunity argument. Accordingly,

IT IS ORDERED:

1. Defendants' motion for summary judgment (filing 26) is granted;

2. Plaintiff's motion for summary judgment (filing 30) is denied;