Stephen C. LEONARD, Plaintiff–
Appellant,

v.

Crispus C. NIX, Defendant–Appellee.

No. 94–1364.

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 10, 1994.

Decided May 16, 1995.

Rehearing and Suggestion for Rehearing
En Banc Denied July 10, 1995.*

* McMillian, Beam, and Morris Sheppard Arnold,
Circuit Judges, would grant the suggestion for
rehearing en banc.

Patrick E. Ingram, Iowa City, IA, argued, for appellant.

William Hill, Des Moines, IA, for appellee.

Before FAGG, WOLLMAN, and HANSEN, Circuit Judges.

HANSEN, Circuit Judge.

Stephen C. Leonard appeals the district court's[1] denial of his 28 U.S.C. § 2254 petition for a writ of habeas corpus. Leonard asserts that Iowa prison officials violated his First Amendment rights by disciplining him for using abusive and defamatory language. The district court found no First Amendment violation, and we affirm.

## I.

Petitioner Stephen C. Leonard, an inmate at the Iowa State Penitentiary (ISP), wrote two letters purportedly as "jailhouse lawyer communications" to a former inmate, Daniel "Flash" Berkenbile, who was then residing in Davenport, Iowa. In the first letter, dated January 6, 1991, and labeled "jailhouse lawyer communication legal mail" on the envelope[2] (App. at 75), Leonard raved the most vulgar, obscene, and racist epithets against the warden, Mr. Nix, an African–American, and other prison staff. As an example, Leonard wrote, "They really got p---ed off for me calling him [Warden Nix] a N-----. Ha. That's why I'm putting it in this letter so many times." (App. at 76.) Leonard then

---

1. The Honorable Ronald E. Longstaff, United States District Judge for the Southern District of Iowa.

2. Leonard's letter to Berkenbile did not fit any of the categories of "confidential mail" established by 201 Iowa Admin.Code § 20.4(2), the Department of Correction's regulation governing prisoner mail sent to courts, agencies, attorneys, etc.

wrote that word in capital letters six times in a row. Leonard continued to make abusive comments about and to Warden Nix ("F--- THAT BLACK B------ AND ALL HIS F--- ING MERRY LITTLE BAND"); comments which would certainly justify prison disciplinary action against Leonard for violation of prison rules if he had spoken the same words directly to the warden. Leonard also revealed his certainty that prison officials would read and copy his letter. Leonard's second letter, dated January 13, 1991, contained more of the same vulgarities. At the end of this letter, clearly referring to the warden and prison staff, Leonard states: "The chief n----- and his WHITE BOY gang will go down in flames. Ha." (App. at 56.)

Because of the abusive and defamatory language used against the warden and prison staff in these purported "jailhouse lawyer communications," prison officials issued disciplinary notices, citing Leonard for violating an ISP rule that prohibits verbal abuse of another person. The ISP disciplinary committee found Leonard guilty of violating ISP institutional rule number 26, which states as follows:

> Verbal Abuse: An inmate commits verbal abuse when the inmate subjects another person to abusive or defamatory language, remarks, or gestures, in writing or orally, and includes insolence or disrespect to another person.

(App. at 173.) For this violation, Leonard received penalties including loss of 90 days of good time credits, 90 days of restriction to his cell, and 15 days of disciplinary detention.

Leonard filed two separate actions for state postconviction relief, alleging that ISP staff violated his First Amendment rights by disciplining him on the basis of the letters. With respect to the first letter, the Iowa district court found as a fact that Leonard "intended to direct the comments at Warden Nix, and that the comments would, in fact, be read by Warden Nix." (App. at 161.) Similar fact-findings were made with respect to the second letter. These findings were based upon the letters themselves in which Leonard states he knows that they will be read and copied and upon the attachments which reveal the source of a disagreement

between the warden and Leonard. (Leonard's previous attempt to form a white supremacist "culture group" at the prison was opposed by the warden and resulted in litigation in federal court.) Furthermore, the Iowa district court found that "both letters sound in some form of jailhouse lawyer communication, which is an act of misuse of the mail," and "that the prison administrators have a legitimate interest in regulating the use of jailhouse lawyer privileges." (*Id.* at 165.)

The Supreme Court of Iowa affirmed the district court's dismissal of both postconviction actions, concluding that the letters "were designed to be used as a vehicle to protest prison authority" and that the prison officials had a legitimate penological objective of maintaining security and order within the institution when they took disciplinary action based upon the letters because "[d]efamation by its very nature causes discipline problems." (*Id.* at 174.)

Leonard then filed this habeas corpus petition, challenging the punishment as an infringement on his First Amendment right to free expression. (Leonard also filed a claim for damages under 42 U.S.C. § 1983, which has been stayed pending the outcome of this case.) The magistrate judge recommended that the writ be granted on the basis that the disciplinary action violated Leonard's First Amendment rights. The district court rejected this recommendation and denied the writ, concluding that the state fact-findings were fairly supported by the record considered as a whole. Leonard appeals.

One week before argument, the warden moved to dismiss the appeal as moot because Leonard had discharged his sentence and was released from custody. We were recently informed by Leonard's counsel that Leonard has since been returned to the custody of the Iowa Department of Corrections on a new sentence.

## II.

■ A petition for habeas corpus must be filed while the petitioner is in custody. *See Maleng v. Cook,* 490 U.S. 488, 109 S.Ct. 1923, 104 L.Ed.2d 540 (1989). If a petitioner,

though released from custody, faces sufficient repercussions from his allegedly unlawful punishment, the case is not moot. *See Carafas v. LaVallee*, 391 U.S. 234, 239–40, 88 S.Ct. 1556, 1560–61, 20 L.Ed.2d 554 (1968) (a habeas petitioner "should not be ... required to bear the consequences of [an] assertedly unlawful conviction simply because the path has been so long that he has served his sentence"). Collateral consequences are presumed to stem from a criminal conviction even after release. *See Sibron v. New York*, 392 U.S. 40, 57, 88 S.Ct. 1889, 1899, 20 L.Ed.2d 917 (1968) (only possibility of collateral consequence needed to avoid mootness). Where the allegedly illegal punishment does not produce any collateral consequences independent of the underlying conviction, the case will be mooted by physical release. *See Lane v. Williams*, 455 U.S. 624, 632–33, 102 S.Ct. 1322, 1327–28, 71 L.Ed.2d 508 (1982) (parole violation has no collateral consequences); *Cox v. McCarthy*, 829 F.2d 800, 803 (9th Cir.1987) (objections to penalty rather than conviction not enough to avoid mootness).

Leonard does not challenge his criminal conviction but rather the legality of prison discipline imposed while serving his sentence. As a collateral consequence, Leonard asserts that his separate civil rights damages claim under 42 U.S.C. § 1983 will be foreclosed if the habeas petition is denied.

▮ A successful habeas petition is a prerequisite to a section 1983 claim that hinges on a finding that the conviction was illegal. *See Heck v. Humphrey*, —— U.S. ——, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). Post-release financial claims dependent on the legality of conviction may be stayed pending review of the conviction, or, as to section 1983 claims after *Heck*, may not accrue until habeas proceedings conclude; but in neither case are they mooted by release. Prisoner damages claims not challenging the underlying conviction likewise survive release from custody. *See Scher v. Chief Postal Inspector*, 973 F.2d 682, 683 (8th Cir.1992); *Cotterall v. Paul*, 755 F.2d 777, 780 (11th Cir. 1985); *Winsett v. McGinnes*, 617 F.2d 996, 1004 (3d Cir.1980) (en banc), *cert. denied*, 449 U.S. 1093, 101 S.Ct. 891, 66 L.Ed.2d 822 (1981). *Cf. Black v. Brown*, 513 F.2d 652, 655 (7th Cir.1975) (release from isolation did not moot damages claim for cruel and unusual punishment). Leonard's section 1983 action gives this case life, for if Leonard wins this habeas action, the state becomes vulnerable to his section 1983 damages claim. Leonard's petition is therefore not moot.

Additionally, Leonard's return to custody dispenses with any doubt that may remain about the existence of collateral consequences in this case. Upon his return to ISP, Leonard's inmate status is marked by the previous rules violation, and if he commits any further infractions he faces more severe treatment because of this prior disciplinary action. Accordingly, Leonard's petition for a writ of habeas corpus is not moot, and we deny the motion to dismiss on this ground.

## III.

▮ In habeas proceedings, we presume state court determinations of fact to be correct unless the factual determinations are not fairly supported by the record. *See* 28 U.S.C. § 2254(d)(8) (1988); *Sumner v. Mata*, 449 U.S. 539, 550, 101 S.Ct. 764, 770, 66 L.Ed.2d 722 (1981); *Blair–Bey v. Nix*, 44 F.3d 711, 713 (8th Cir.1995); *Bainter v. Trickey*, 932 F.2d 713, 715–16 (8th Cir.1991). Leonard contends that the state court findings of fact are not supported by the record and that he cannot be punished for making any comments, however demeaning, disrespectful, or derogatory, about prison officials in a letter bearing an address to a third party outside the prison. In his testimony before the Iowa district court, Leonard repeatedly testified that under his absolutist reading of the First Amendment, "I can write anything I want." (App. at 25, 26.) We believe that Leonard mischaracterizes the facts in this case, that the facts as found by the state courts are fairly supported by the record, and that the disciplinary action taken against him does not amount to a First Amendment violation.

"Assuming for the sake of argument that the First Amendment protects speech like that at issue here, although we doubt such proposition, the prison officials still did not

violate [Leonard's] rights under the Constitution." *Goff v. Dailey,* 991 F.2d 1437, 1439 (8th Cir.1993) (Iowa inmate disciplined for verbal abuse—not a constitutional violation). *See R.A.V. v. City of St. Paul, Minn.,* —— U.S. ——, ——, 112 S.Ct. 2538, 2544, 120 L.Ed.2d 305 (1992) (hate speech constitutes " 'no essential part of any exposition of ideas' ") (quoting *Chaplinsky v. New Hampshire,* 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942)).

■■■■ " '[L]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.' " *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974) (quoting *Price v. Johnston,* 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948)) (other citation omitted). "In the First Amendment context a corollary of this principle is that a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Id.* Prison rules censoring a prisoner's personal outgoing mail are justified only if the regulation or practice in question furthers an important governmental interest of security, order, or rehabilitation, and the limitation on the prisoner's retained First Amendment rights must be no greater than is necessary to protect the governmental interest. *Procunier v. Martinez,* 416 U.S. 396, 413, 94 S.Ct. 1800, 1811, 40 L.Ed.2d 224 (1974).

> This does not mean, of course, that prison administrators may be required to show with certainty that adverse consequences would flow from the failure to censor a particular letter. Some latitude in anticipating the probable consequences of allowing certain speech in a prison environment is essential to the proper discharge of an administrator's duty. But any regulation or practice that restricts inmate correspondence must be generally necessary to protect one or more of the legitimate governmental interests identified above.

*Id.* at 414, 94 S.Ct. at 1811–12 (analysis limited to outgoing mail by *Thornburgh v. Abbott,* 490 U.S. 401, 411–13, 109 S.Ct. 1874, 1880–81, 104 L.Ed.2d 459 (1989)). Outgoing personal correspondence does not generally pose a serious threat to prison order and security. *Abbott,* 490 U.S. at 411, 109 S.Ct. at 1880. For this reason, a prisoner's personal outgoing mail is unrestricted unless it falls into categories which present a threat to prison order and security, such as, but not limited to, "escape plans, plans related to ongoing criminal activity, and threats of blackmail or extortion." *Id.* at 412, 109 S.Ct. at 1881 (citing *Martinez,* 416 U.S. at 412–13, 94 S.Ct. at 1811).

In this case, Leonard was disciplined for violating a prison rule against written verbal abuse of another person. The Iowa courts found that the letters written by Leonard that resulted in disciplinary action against him were not genuine, personal outgoing mail but were in fact diatribes directed at and toward the warden and the prison staff as a vehicle of protest. We must determine whether this finding of fact is fairly supported by the record.

We first note that Leonard conspicuously labeled the first letter as a jailhouse lawyer communication on the envelope, drawing immediate attention to it as something other than the usual personal letter. Leonard's purported reason for writing to Berkenbile was to send to Berkenbile a formal, detailed, and completed § 1983 complaint with accompanying motions, affidavits, and detailed instructions for Berkenbile to file in federal court seeking damages for the alleged deprivation of *Berkenbile's* (*not* Leonard's) constitutional rights resulting from an earlier interception by the prison authorities of correspondence between them. Leonard, a self-described jailhouse lawyer, was permitted to assist other inmates with their legal matters. Without a law license, however, he had no right to draft complaints for, or give legal advice to, nonprisoners. Prison authorities have a right to ensure that inmate "jailhouse lawyers" abide by the rules governing them, and when Leonard marked the unsealed envelope addressed to Berkenbile as "jailhouse lawyer communication," he invited an inspection to make sure he was operating within the rules governing his writ-writing activities.

The prison rule violation is apparent in the vile language and the structure of the letters themselves, all of which we will not here repeat. Leonard was, in fact, flouting the system and exploiting the First Amendment by directing written verbal abuse at and toward the warden through these purported jailhouse lawyer communications and then claiming First Amendment protection for his misconduct. There is little doubt that the same language, if spoken by Leonard directly to the warden, would result in justifiable disciplinary action to preserve discipline and order. There is also little doubt that Leonard is attempting to use this court not as a means of protecting his right to engage in the free interchange of ideas, which is the founding purpose of the First Amendment's guarantee of free speech, see *Connick v. Myers,* 461 U.S. 138, 145, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708 (1983), but as a means of ensuring for himself the special privilege of directly attacking the warden with written racial epithets without disciplinary consequence.[3] We are convinced that there is a fundamental distinction that can be drawn in the prison context between permissible and constitutionally protected "unflattering" remarks about prison staff in personal correspondence directed to a recipient on the outside, see *Smith v. Delo,* 995 F.2d 827, 832 (8th Cir.1993), and impermissible written abusive language that is directed not to the addressee but at and to the warden. The type of hate speech Leonard directed at Warden Nix "is of such slight social value as a step to truth that any benefit that may be derived from [it] is clearly outweighed by the social interest in order and morality." *Chaplinsky,* 315 U.S. at 572, 62 S.Ct. at 769. This is especially true in the prison context. " 'Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution....' " *Id.* (quoting *Cantwell v. Connecticut,* 310 U.S. 296, 309–310, 60 S.Ct. 900, 906, 84 L.Ed. 1213 (1940)).

After carefully considering the record, including the structure of the letters themselves, the context in which they were written, and Leonard's testimony before the Iowa district court during his postconviction relief proceedings, we conclude that the state court's fact-findings are fairly supported by the record and that this is a case where the prisoner purposefully aimed his written comments not at the addressee on the envelope, but directly at the warden in the sure and certain knowledge that he would hit his target even though he fired through the camouflage of an envelope addressed to the outside.

This is not a case like *Loggins v. Delo,* 999 F.2d 364 (8th Cir.1993), where a prisoner conveyed to his brother in personal correspondence his personal feelings about a prison staff member which were derogatory and insulting, with the mere knowledge that the letter might be read. Unlike *Loggins,* Leonard did not merely know that the letter might be read, instead he directed his defamatory and abusive comments expressly to the warden and staff for the purpose of making his feelings known *to them.* For the same reason, this case is distinguishable from *McNamara v. Moody,* 606 F.2d 621, 623–24 (5th Cir.1979) (holding prison cannot censor inmate's letter to his girlfriend containing disparaging remarks about prison staff; no prison rules were implicated), and *Brooks v. Andolina,* 826 F.2d 1266, 1268 (3d Cir.1987) (holding prison cannot discipline an inmate for disrespect for remarks inmate made in a letter to NAACP complaining about the conduct of a guard).

■ We conclude that the prison officials disciplined Leonard to preserve order, a legitimate penological interest. Admittedly, this case does not fit neatly into one of the categories previously delineated by the Supreme Court as personal correspondence that presents a threat to order and security. Nevertheless, we cannot ignore the reality that Leonard clearly was not making legiti-

---

**3.** In the first letter, Leonard stated:
I want you to know that they are going to copy this letter also but I really don't give a f---. I stand beside the 1st Amendment. I can say anything I want about this motherf---ing n----- and he can't do a f---ing thing about it. Ha.

(App. at 77.) After the first communication had been delayed, Leonard promised in the second communication at issue that "[t]he federal court will burn their a--es for withholding my mail" (App. at 119.) We decline to light the fire.

mate use of the outgoing mail for personal private correspondence. Rather, Leonard directed abusive and defamatory comments destructive of good order and discipline to the warden and staff by using purported and illegitimate jailhouse lawyer mail as his method of delivery. We conclude that when a prisoner is not sending legitimate personal correspondence, defamatory comments that are directed at the warden and prison staff through the guise of a jailhouse lawyer communication properly subject the prisoner to discipline to preserve the prison's penological interest in order, and that Leonard's discipline does not violate the First Amendment.

### IV.

Because of the possibility of section 1983 damages, and because Leonard is now in custody again, this habeas petition is not moot. Because Leonard's letters were improper jailhouse lawyer communications and the defamatory comments were directed toward prison officials, they cannot fairly be characterized as purely outgoing personal correspondence within the holdings of *Martinez* and *Abbott*. Therefore, prison officials did not violate Leonard's First Amendment rights by disciplining him for verbal abuse in violation of prison regulations. Accordingly, we affirm the judgment of the district court.

WOLLMAN, Circuit Judge, dissenting.

Although I agree that this case is not moot, I would hold that the district court should have adopted the magistrate judge's thoughtful recommendation.

### I

This is an outgoing prisoner correspondence case, remarkable only for the hatefulness of the invective employed, in which an inmate, in the full knowledge that his letters to a friend outside the prison would be read by prison authorities, wrote comments about prison officials and speculated about the impact his insults might have on the officials responsible for reading outgoing inmate mail. Such outgoing correspondence criticizing or insulting prison authorities has been held to come within the protection of the First Amendment. *Procunier v. Martinez*, 416 U.S. 396, 413, 94 S.Ct. 1800, 1811, 40 L.Ed.2d 224 (1974); *Loggins v. Delo*, 999 F.2d 364, 367 (8th Cir.1993); *Brooks v. Andolina*, 826 F.2d 1266, 1268 (3rd Cir.1987); *McNamara v. Moody*, 606 F.2d 621, 624 (5th Cir.1979), *cert. denied*, 447 U.S. 929, 100 S.Ct. 3028, 65 L.Ed.2d 1124 (1980).

Leonard put letters in the normal outgoing mail channels in the hope they would eventually reach addressee Daniel Berkenbile. Because there is no indication that Berkenbile is a not a real person or that the letters were otherwise intended only for the eyes of prison officials, the letters constituted legitimate outgoing correspondence entitled to First Amendment protection. *Thornburgh v. Abbott*, 490 U.S. 401, 411–12, 109 S.Ct. 1874, 1880–81, 104 L.Ed.2d 459 (1989); *Martinez*, 416 U.S. at 413–14, 94 S.Ct. at 1811–12; *Loggins*, 999 F.2d at 367–68; *cf. Turner v. Safley*, 482 U.S. 78, 89–93, 107 S.Ct. 2254, 2261–64, 96 L.Ed.2d 64 (1987) (discussing standards to be applied to prisoner correspondence cases, without specific reference to outgoing abusive mail); *Smith v. Delo*, 995 F.2d 827, 829–30 (8th Cir.1993) (same), *cert. denied*, —— U.S. ——, 114 S.Ct. 710, 126 L.Ed.2d 676 (1994).

Prisoner speech can be limited only if the regulation is "reasonably related to legitimate penological interests." *Safley*, 482 U.S. at 89, 107 S.Ct. at 2261. Under this rule, inmate correspondence may be subject to limited regulation in furtherance of the legitimate prison interest in order and security. *Martinez*, 416 U.S. at 413, 94 S.Ct. at 1811. However, outgoing inmate mail usually does not "pose a serious threat to prison order and security," *Abbott*, 490 U.S. at 411, 109 S.Ct. at 1880, and is therefore unrestricted unless it relates to escape plans, ongoing criminal activity, blackmail, or extortion, *id.* at 412, 109 S.Ct. at 1881; *Martinez*, 416 U.S. at 413, 94 S.Ct. at 1811. No such illegal activity is involved here; instead, the court restricts Leonard's letters on the basis that Leonard's invective by its very nature created a threat to prison order and security.

This would be true had Leonard spoken to prison officials, because such inflammatory speech inside a prison produces an immediate physical threat to order. *Goff v. Dailey*,

991 F.2d 1437, 1439 (8th Cir.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 564, 126 L.Ed.2d 464 (1993). But this is a mail case. Outgoing mail is not regulated as strictly as in-prison communication for the good reason that it "cannot reasonably be expected to present a danger to the community *inside* the prison." *Abbott,* 490 U.S. at 411–12, 109 S.Ct. at 1881 (citing *Martinez,* 416 U.S. at 416, 94 S.Ct. at 1813). A holding that Leonard's mailed invective itself violated the verbal abuse rule ignores the carefully nuanced structure the Supreme Court has erected to allow for the discipline of inmates whose confrontational comments were never intended to leave the prison community, while at the same time protecting inmates who use the mail to express perhaps identical views outside prison walls where those views cannot harm prison order and security. *Andolina,* 826 F.2d at 1268 (applying structure erected in *Safley,* 482 U.S. at 88–91, 107 S.Ct. at 2261–63, and *Martinez,* 416 U.S. at 412–14, 94 S.Ct. at 1811–12, and citing *McNamara,* 606 F.2d at 624, to the effect that if identical statement were oral rather than mailed, punishment would be allowed); *see Abbott,* 490 U.S. at 411–14, 109 S.Ct. at 1880–82 (further articulating *Safley/Martinez* rationale).

That Leonard intended his comments to come to the attention of the prison authorities does not distinguish this case from those in which the correspondence was held protected. All inmates know their mail can be read by prison officials; indeed, in all the similar cases, the inmate acknowledged the possibility of interception and tweaked the official reader or otherwise clearly expressed the hope that his mail would be read by prison officials. *Loggins,* 999 F.2d at 365 (acknowledging the possibility and plainly intending to tweak the official reader); *McNamara,* 606 F.2d at 623 n. 2 (showing certain knowledge the invective would be read). Nevertheless, these and all other post-*Martinez* decisions on point have uniformly protected the outgoing mail rights of inmates who, like Leonard, were trying to reach legitimate correspondents.

## II

I also disagree that fair evidentiary support is the issue in this case, for the factual findings of the Iowa courts are in effect accepted by Leonard. Rather, Leonard argues that under well-established legal precedent, the key fact found by the courts is not enough to support the conclusion that his comments were "directed toward" prison officials, as defined in *Loggins,* 999 F.2d at 367. The Iowa tribunals' conclusions that the derogatory comments were directed toward prison officials hinged on the fact that Leonard knew it was likely his letters would be intercepted. Committee decision, App. at 137; District Court decision, App. at 161; Supreme Court decision, App. at 173–74. As the discussion above shows, the fact that a prisoner knows authorities will read his mail does not support the conclusion that mail legitimately addressed outside the prison is directed toward prison officials.

One would hope that Warden Nix is too busy with important work to bother to screen outgoing prisoner correspondence. Those prison staff members who perform this duty are presumably inured to the hate-filled diatribes of the Stephen Leonards of the world and thus undoubtedly treat such correspondence with the disdain it deserves.

I respectfully dissent.