_____

No. 95-2314
_____

Donald Duane Ochs,                      *
                                        *
     Plaintiff - Appellant,             *
                                        *
     v.                                 *
                                        *  Appeal from the United States
John A. Thalacker, Warden, Iowa         *  District Court for the
Men's Reformatory; John Sissel;         *  Northern District of Iowa.
Russell Behrends; Ralph                 *
Schafer; Mona Burns; Larry              *
Hebron; Jerome Manternach,              *
                                        *
     Defendants - Appellees.            *
                                  _____

                    Submitted:  February 22, 1996

                      Filed:  July 22, 1996
                                  _____

Before FAGG, BOWMAN, and LOKEN, Circuit Judges.
                                  _____

LOKEN, Circuit Judge.

     In this § 1983 action, Iowa inmate Donald Duane Ochs claims that
officials at the Iowa Men's Reformatory ("IMR") violated his First
Amendment and Due Process rights by refusing to honor his religiously-
motivated request to be housed with persons of his own race and by
segregating him for making that request, and violated his Eighth Amendment
rights by being deliberately indifferent to his allergic reaction to metal
handcuffs.  After a bench trial, the district court[1] dismissed these
claims.  Ochs appeals.  The primary issue is whether IMR's response to his
request to be racially

_____

     [1]The HONORABLE JOHN A. JARVEY, Chief United States Magistrate
Judge for the Northern District of Iowa, who tried the case by
consent of the parties pursuant to 28 U.S.C. § 636(c).

segregated substantially burdened his free exercise of religion and was not the "least restrictive means of furthering [a] compelling government interest," the new governing standard under the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. § 2000bb-1. We affirm.

## I.

On February 2, 1994, sixty to seventy inmates housed in IMR's Living Unit B took part in a racially-charged fight between members of white and African-American gangs. This was the most serious disturbance at IMR since a major riot in the 1970s. It was followed by a smaller, but serious, racial incident on February 18, which began as a fight but evolved into a scheme by Unit B inmates to trap prison guards who responded to the fight. As a result, IMR officials locked down Unit B, confining its 550 inmates to their cells while the causes of these disturbances were investigated.

At this time, Donald Ochs was serving a ten-year sentence for second degree robbery, housed in IMR's Unit B. Although Ochs had lived with non-white cellmates in the past, on February 16, in the midst of these racial tensions, Ochs sent the following "notice" to IMR officials:

> I am a white American. My race is Anglo-Saxon. The tone and color of my skin is white. My religious, political and moral beliefs forbid my integrating with any member of any other race. I therefore give notice that I do not wish to be integrated now or anytime in the future, and if I must be housed with another person (i.e., in the same cell) I request that person be of my own race.

On February 24, IMR officials lifted Unit B's lockdown status and began reintegrating its inmates "into the everyday flow of the institution," as Security Director Russell Behrends put it at trial. However, Ochs and twenty-five others were placed in "non-voluntary, non-disciplinary" status, and Ochs was randomly assigned

an African-American cellmate, Nelson McAlpine.[2]  Ochs filed a grievance, asking to be released to the general inmate population or transferred to the Iowa State Penitentiary.  At a March 3 classification review hearing, Ochs stated that he is a "Neo-Nazi skinhead" who advocates white separatism and shaves his head to show his beliefs.  He did not claim that his separatist views were religiously motivated.  He was told that he would not be released from segregated status until his hair grew long enough to cover his shaved head.   On March 22, Ochs was transferred to Iowa State Penitentiary.  Two months later, he filed this damage action.

## II.

Ochs first argues that IMR officials violated his First Amendment right to the free exercise of religion when they refused his request that he be assigned only caucasian cellmates.  At trial, Warden Thalacker testified that it was IMR's policy not to racially segregate inmates because segregation would foster gang activity and escalate racial tensions, and because it would be very difficult to accommodate inmates' various preferences.  The district court credited Thalacker's testimony and concluded that this policy did not violate Ochs's First Amendment rights.

RFRA provides:  "Government shall not substantially burden a person's exercise of religion [unless] application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."   42 U.S.C. §§ 2000bb-1(a) and (b).   RFRA was enacted to legislatively overrule Employment Division v. Smith, 494 U.S. 872 (1990), and restore the "compelling interest" test of earlier cases.  See 42 U.S.C. §§ 2000bb(a)(4) and

---

[2]During their week as cellmates, Ochs and McAlpine ignored one another.  McAlpine testified that there was tension when they shared the cell because Ochs is a racist.

(b)(1).  Congress intended that RFRA apply to prison inmate Free Exercise Clause cases.  However, the legislative history urges courts to "continue the tradition of giving due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources."  S. Rep. No. 111, 103d Cong., 1st Sess., at 10 (1993), reprinted in 1993 U.S.C.C.A.N. 1892, 1900.

Under the prior law restored by RFRA, Ochs must first prove that prison officials substantially burdened a sincerely held religious belief. Iron Eyes v. Henry, 907 F.2d 810, 813 (8th Cir. 1990).  If he makes that showing, the burden on his free exercise of religion must be balanced against the penological interest justifying that burden.  Though burdens on free exercise may be no greater than necessary to protect the government interest, "prison officials ordinarily must have wide latitude within which to make appropriate limitations to maintain institutional security." Hamilton v. Schriro, 74 F.3d 1545, 1554 (8th Cir. 1996), applying RFRA, Pell v. Procunier, 417 U.S. 817 (1974), and Procunier v. Martinez, 416 U.S. 396 (1974).

Like the district court, we are skeptical that Ochs's request to be racially segregated, first made in the midst of prison racial disturbances, reflected a sincerely held religious belief.  See Winters v. Iowa, No. 95-723, 1996 WL 333156 (Iowa June 19, 1996), rejecting a similar claim by another white separatist inmate at IMR.  Purely secular views or personal preferences will not support a Free Exercise Clause claim.  Frazee v. Illinois Employment Sec. Dept., 489 U.S. 829, 833 (1989).  Though Ochs testified that he follows the "Church of Jesus Christ Christian," he did not explain why this religion suddenly mandated that he no longer share his cell with an African-American.  However, we decline to decide the case on this ground.  Courts must be cautious in attempting to separate real from fictitious religious beliefs.  See Thomas v.

-4-

Review Bd. of Ind. Employment Sec. Div., 450 U.S. 707, 713-16 (1981). The district court did not make a specific finding on this issue, and we held in Wiggins v. Sargent, 753 F.2d 663, 666-67 (8th Cir. 1985), that professed Church of Jesus Christ Christian beliefs cannot be dismissed out of hand in a Free Exercise Clause case. See also Murphy v. Missouri Dept. of Corrections, 814 F.2d 1252, 1255-57 (8th Cir. 1987) (total ban on Aryan Nation racist literature overbroad); Van Dyke v. Washington, 896 F. Supp. 183, 187 (C.D. Ill. 1995).

We also question whether IMR officials "substantially burdened" a sincere religious belief, a RFRA term discussed at some length in Young v. Crystal Evangelical Free Church, 82 F.3d 1407, 1418 (8th Cir. 1996). RFRA's legislative history urges courts to weed out "false religious claims that are actually attempts to gain special privileges or to disrupt prison life." S. Rep. No. 111, 1993 U.S.C.C.A.N. at 1900. Ochs claims a "religious" mandate directed at an entirely secular aspect of life, the race of his cellmate. Inmates could similarly claim religious preferences for the timing of meals, the number of showers, the television programs and movies to be viewed, or most any other aspect of prison life. In Green v. White, 525 F. Supp. 81 (E.D. Mo. 1981), aff'd, 693 F.2d 45 (8th Cir. 1982), cert. denied, 462 U.S. 1111 (1983), for example, free exercise claims were made for conjugal visits, banquets, and payment for services as chaplain. The district court rejected those claims, we affirmed, and Green was cited favorably in the RFRA legislative history. See S. Rep. No. 111, 1993 U.S.C.C.A.N. at 1901 n.30.

We note these threshold RFRA issues but do not decide them. Rather, we hold that IMR officials properly rejected Ochs's request for racially segregated living quarters *even if* that substantially burdened his sincerely held religious beliefs. IMR's decision was made to further the most compelling governmental interest in a prison setting, institutional security. IMR policy makers believe

that random cell assignments lessen racial tensions and promote security, and that no less restrictive policy can meet their security objectives, particularly at a time of racial tension like February and March of 1994. We must give great deference to these penological judgments regarding security.  See Bell v. Wolfish, 441 U.S. 520, 550-51 & n.32 (1979); Hamilton, 74 F.3d at 1554.  Thus, while Ochs argues that it would be relatively easy for IMR to quietly accommodate the requests of a few white racists, we may not ignore defendants' response that allowing such exceptions would create serious administrative and security problems.[3]  In these circumstances, we affirm the dismissal of this claim.

### III.

Ochs next argues that IMR officials violated his First Amendment and Due Process rights when they segregated him from the general inmate population as punishment for his request for white cellmates.  The district court rejected this claim because it found that IMR officials segregated Ochs not to punish him, but to protect him and others because he had identified himself as a racist at a time of racial tensions in the prison. We agree.

When IMR officials began to integrate Unit B inmates into the general population after the racial disturbances, they segregated Ochs (and four others who had expressed similar views) because his blatant racism -- reflected in the notice of separatist views and

---

[3]It is also relevant that Ochs seeks to compel IMR, in the name of his religion, to violate the public policy of this country against racial segregation.  IMR would risk § 1983 litigation if it assigned cells based upon inmate racial preferences.  Finney v. Arkansas Bd. of Correction, 505 F.2d 194, 209 (8th Cir. 1974).  In our pluralistic society, Ochs is free to hold beliefs, including religious beliefs, that are contrary to public policy or the majority's views.  But he should not be permitted to compel prison administrators to accommodate those beliefs through secular actions that would put the prison in conflict with federal and state laws and policies.

his shaved head -- made him a risk to prison security, and because they were still investigating whether Ochs had played any role in the recent disturbances.  At the March 3 review hearing, Ochs admitted to being a Neo-Nazi.  Accordingly, IMR officials kept him segregated until he could be transferred to another prison.

Ochs argues that the district court's finding that he publicly espoused his racism is clearly erroneous because he did not publicize his request for white cellmates to other inmates.  But Ochs's shaved head and blatantly racist comments at the review hearing justified defendants' belief that his immediate release into the general prison population after two racial disturbances would create an unacceptable security risk.  Ochs had no First Amendment right to flaunt beliefs that jeopardized prison security.  See Leonard v. Nix, 55 F.3d 370, 374-75 (8th Cir. 1995).  Thus, he failed to prove that the defendants' motive in placing him in segregated status was punishment or impermissible retaliation.  See Goff v. Burton, 7 F.3d 734, 737 (8th Cir. 1993), cert. denied, 114 S. Ct. 2684 (1994).[4]

## IV.

Finally, Ochs argues that defendants violated his Eighth Amendment rights when they were deliberately indifferent to his serious medical need for protection from metal handcuffs.  See generally Estelle v. Gamble, 429 U.S. 97, 104 (1976).  Following the racial disturbances, Ochs and other inmates were taken to the shower in handcuffs.  Because of his allergy condition, IMR Health Services had issued Ochs stockinettes to protect his wrists when handcuffed.  However, the stockinettes were lost, and two or three

---

[4]It is not clear whether Ochs intended to raise a separate due process claim regarding his segregation.  If so, it is without merit, because his administrative segregation was not "the type of atypical, significant deprivation" to which due process protections attach under Sandin v. Conner, 115 S. Ct. 2293, 2301-02 (1995).

times during the Unit B lockdown, Ochs walked to the shower in handcuffs without protection for his wrists.  He developed a skin rash that itched but was not painful.  Warden Thalacker told Ochs to notify the nurse of this problem.  When he did so four or five days later, he received new stockinettes to protect his wrists.

We agree with the district court that Ochs failed to prove a "serious medical need."  IMR Health Services diagnosed Ochs's allergy and provided him with stockinettes to protect his wrists while handcuffed.   The stockinettes were missing when Ochs needed to be handcuffed during a lockdown.  As a result, Ochs experienced mild discomfort from two or three brief exposures to metal handcuffs.  He was issued new stockinettes as soon as he requested help from a medical professional.  In these circumstances, Ochs has not established that IMR officials "ignored an acute or escalating situation involving a serious medical condition."  Givens v. Jones, 900 F.2d 1229, 1233 (8th Cir. 1990); see also Beyerbach v. Sears, 49 F.3d 1324, 1326 (8th Cir. 1995).

The judgement of the district court is affirmed.

A true copy.

        Attest:

            CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

-8-