Anthony QUINN; Larry Starks, Jr.; Corvelle Beeks; Donta T. McKenzie; Plaintiffs–Appellees,

v.

Crispus C. NIX; John Emmett; Defendants–Appellants,

Paul W. Grossheim, Defendant.

No. 92–1262.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 10, 1992.

Decided Jan. 5, 1993.

**116**

Kristin Wright Ensign, Asst. Atty. Gen., Des Moines, IA, argued for appellants.

Guy Richard Cook, Des Moines, IA, for appellees.

Before RICHARD S. ARNOLD, Chief Judge, FLOYD R. GIBSON, Senior Circuit Judge, and LOKEN, Circuit Judge.

FLOYD R. GIBSON, Senior Circuit Judge.

The appellants, both of whom are officials at the Iowa State Penitentiary (ISP), appeal the judgment of the district court[1] determining that they violated the plaintiffs' civil rights. On the basis of the record before us, we affirm.

## I. BACKGROUND

The Iowa State Penitentiary Manual for the Guidance of Inmates (hereinafter "the Manual") contains the following statement regarding hairstyles:

> Inmate hairstyles should be neat and well cared for at all times. Extreme hairstyles should be avoided. Sideburns, mustaches and beards are allowed. Also, they must be maintained in a neat manner. Nets or other appropriate types of covering may be required for safety or hygienic reasons at some job assignments. Examination of beards or hair may be required at shakedowns.

Within the restrictions imposed by this guideline, inmates are allowed to select their own hairstyle and length.

The plaintiffs, all of whom are inmates at ISP, wore their hair in a style referred to as a "shag." "Shag" describes a variety of styles, with the common feature being the hair on the back of the head and/or neck is not cut, but instead is allowed to grow. Shags do not all appear the same; the uncut portion may be grown into a tail, a ball, a bun, a bar, or even simply allowed to grow without any design or style over the individual's collar. The plaintiffs had worn their hair in a shag style for varying periods of time, ranging from two years to three months. Additionally, other inmates and some prison employees wore their hair in a shag.

In the early or middle part of November 1990, the four plaintiffs were ordered to

---

1. The Honorable Charles R. Wolle, United States District Judge for the Southern District of Iowa.

get their hair cut. On November 20, Starks sent a memo to the warden (Crispus Nix), asking for clarification of the policy on hairstyles. John Henry,[2] the deputy warden, responded to Starks' memo by instructing him to "[r]ead the inmate guide book—extreme hairstyles not permitted."

On November 28, the prison's "gang monitor," Don Lynch, received drawings of six haircuts that were suspected of being gang-related from the Iowa Division of Criminal Investigation (IDCI). To these drawings he added a drawing of a haircut he had observed in the prison, and circulated the pictures to other prison officials in the form of a memo.

On December 6, certain inmates' hairstyles were inspected by prison officials, including John Emmett (the prison's security director) and Lynch. The inspection was videotaped. Some inmates (including the plaintiffs) were ordered to have their hair cut; those that agreed to comply with this order had their hair cut immediately, and those that declined were given five days restriction in the maximum security cellhouse. Starks and McKenzie chose to have their hair cut to avoid discipline; Quinn and Beeks refused to have their hair cut and were immediately escorted to lockup. Within the next two days, Quinn and Beeks both spoke with Nix and agreed to cut their hair. Near the end of December, Starks filed a grievance complaining about the order to cut his hair. On January 11, 1991, Lynch responded by informing Starks his hair was of an "extreme nature."

The plaintiffs sued, asserting violations of their constitutional rights. Excerpts from the videotape of the December 6 inspection were admitted into evidence; they depict the inspections of Quinn, Beeks, Starks, and two other inmates; McKenzie does not appear on the tape. All five individuals pictured on the tape wore different styles of shag cuts, but only four were ordered to get their hair cut. Those that were ordered to get hair cuts asked why the order was being made, but they were not provided with any answers. The record reflects that certain white inmates (the plaintiffs are black) were permitted to keep their shag styles. The record also reflects that Quinn and Starks were never told their hair was gang-related, and that Beeks was not informed until after he was released from lockup. The record does not reflect what, if anything, McKenzie was told.

The materials Lynch received from IDCI and the memo he created from those materials were admitted into evidence. Unfortunately, despite the best efforts of counsel and court personnel, these materials cannot be located and are not part of the record on appeal.

The prison officials testified they ordered the inmates to cut their hair because the hair appeared to be gang-related, and the orders represented an attempt to eliminate the potential for gang-related problems. The district court found this explanation to be suspect because 1) the plaintiffs were not initially (and in some cases were never) told the reason their hair had to be cut was because it appeared to be gang-related; 2) Lynch did not receive the drawings from IDCI until after the plaintiffs were ordered to cut their hair; and 3) the plaintiffs' hair did not look like the drawings of gang-related hair Lynch received from IDCI, nor did it look like the hair depicted in Lynch's drawing. The district court therefore rejected the defendants' proffered explanation and concluded they ordered the plaintiffs to cut their hair without any legitimate penological purpose in violation of their liberty and equal protection rights.[3] The court awarded damages to Quinn and Beeks in the amount of $750 each and Starks and McKenzie in the amount of $300

---

2. Henry was a defendant in this case, and judgment was entered against him. Henry died after this case was briefed, but before oral argument, and the defendants assented to a suggestion of death filed on Henry's behalf.

3. The equal protection claim was based on the assertion that white inmates with shags were allowed to keep their hairstyles, while only black inmates with shags were ordered to get haircuts.

each.[4] The court also entered declaratory relief, which granted the plaintiffs the right to wear their hair in a shag "so long as defendants have no legitimate penological interest to require them to shorten their hairstyle." *Quinn v. Nix*, No. 4–91–CV–80137, slip op. at 12 (S.D.Iowa Dec. 30, 1991). The prison officials appeal.

## II. DISCUSSION

The Supreme Court has assumed, without deciding, that citizens have a liberty interest, protected by the Fourteenth Amendment, in their personal appearance. *Kelley v. Johnson*, 425 U.S. 238, 244, 96 S.Ct. 1440, 1444, 47 L.Ed.2d 708 (1976). It also appears that ISP, in establishing guidelines for determining what are and are not acceptable hairstyles, has created a liberty interest in the inmates' hairstyles. *Cf. Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 462–63, 109 S.Ct. 1904, 1909–10, 104 L.Ed.2d 506 (1989) (explaining attributes of prison regulations that create liberty interests). In any event, the appellants do not challenge the district court's legal conclusion that the plaintiffs had a liberty interest, so we accept it as true.

 When analyzing actions that impinge upon prisoners' constitutional rights, we must steer between two well-established principles: on the one hand, prisoners do not lose all their constitutional rights while behind bars; on the other hand, federal courts must defer to the judgment of those officials responsible for the inordinately difficult task of operating a prison. *Turner v. Safley*, 482 U.S. 78, 84–85, 107 S.Ct. 2254, 2259–60, 96 L.Ed.2d 64 (1987); *Procunier v. Martinez*, 416 U.S. 396, 404–05, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974). In determining the reasonableness of a prison regulation, we examine the following factors:

(1) whether there is a valid, rational connection between the prison regulation and the legitimate, neutral governmental interest used to justify it; (2) whether there exist alternative means for prisoners to exercise the constitutional right at issue; (3) the impact that would be caused by accommodation of the right on prison staff, inmates, and allocation of prison resources; and (4) whether any alter[n]ative exists that would fully accommodate the prisoner's right at *de minimis* cost to valid penological interests.

*Iron Eyes v. Henry*, 907 F.2d 810, 813 (8th Cir.1990) (citing *Turner*, 482 U.S. at 89–91, 107 S.Ct. at 2261–63).

 The prison officials insist they have a legitimate penological interest in curtailing gang activity. We do not dispute this contention, nor do we discern anything in the district court's opinion that would deny them this ability. However, the district court made a factual finding that this legitimate penological interest was not the motivation for the officials' actions. Prison officials are not entitled to the deference described in *Turner* and *Procunier* if their actions are not actually motivated by legitimate penological interests at the time they act. Thus, we are not called on to decide whether prison officials have a legitimate penological interest in the length of prisoners' hair, nor are we called on to decide the lengths prison officials may go in curtailing gang activity within the prison's walls. All we are called on to do is review the district court's factual determination that the prison officials in this case were not motivated by the legitimate interests they assert. With this in mind, we are constrained to affirm the district court.

The district court initially doubted the prison officials' explanation because they ordered the inmates to cut their hair before Lynch received the memo about gang-related hair from IDCI. The court also doubted the asserted urgency of the officials' concern because they waited approximately three weeks between the time they first ordered the hair cuts and the delivery of ultimatums on December 6. The court also noted the officials' failure to tell the prisoners why their hair was deemed "extreme." Finally, the court compared the prisoners'

---

**4.** The court determined there was no evidence of wrongdoing on the part of defendant Paul Grossheim, and the plaintiffs do not appeal this determination.

hairstyles with those depicted in the memo, and found they were not the same. Based on these findings, the court held the officials' proffered justification for their actions was pretextual and was therefore in violation of the prisoners' civil rights.

We examine the district court's factual findings for clear error. Fed.R.Civ.Pro. 52(a). Nothing appearing in this record leaves us " 'with the definite and firm conviction that a mistake has been committed.' " *Anderson v. Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). There appears little doubt that the materials from IDCI were not received until after the inmates were ordered to cut their hair. We cannot review the court's determination that the inmates' hair is not similar to that described as gang-related because the material Lynch received from IDCI is not in the record; thus the officials cannot carry their heavy burden of demonstrating that the court's finding in this regard is erroneous. We therefore affirm the district court simply because there is nothing in this record to demonstrate the presence of clear error.

The officials also contend they are entitled to qualified immunity. Their arguments in this regard mirror their arguments on the underlying complaint; they reason that they are entitled to immunity because their actions were motivated by legitimate penological concerns. We affirm the denial of qualified immunity because we have affirmed the district court's determination that the officials did not act out of legitimate concerns.