**Mark A. WARES, Plaintiff,**

v.

**D.A. VANBEBBER, et al., Defendants.**

**No. 99–3362–JWL.**

United States District Court, D. Kansas.

May 28, 2004.

1238

Matthew C. Miller, Scott C. Nehrbass, Shook, Hardy & Bacon L.L.P., Overland Park, KS, for Plaintiff.

Martha M. Snyder, Office of Attorney General, Topeka, KS, for Defendants.

### MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

Plaintiff Mark A. Wares brought this civil rights action alleging that defendants VanBebber, Green, Geither and Bruce substantially interfered with his right to freely exercise his religion as guaranteed by the First Amendment. In particular, Mr. Wares alleges that defendants interfered with his right to observe the Jewish holiday of Sukkot in 1997 through 2000 by failing to initially provide him with a Sukkah booth and, once one was provided, by failing to take measures to properly secure it in the prison yard. Mr. Wares seeks nominal and punitive damages to remedy these alleged violations.

The matter is presently before the court on defendants' motion for summary judgment (Doc. 142). Therein, defendants argue that summary judgment is proper because: (1) Mr. Wares failed to establish that prison officials violated his rights under the Free Exercise Clause; (2) defendants are entitled to qualified immunity; and (3) the Prison Litigation Reform Act ("PLRA") precludes Mr. Wares from recovering nominal and punitive damages. As set forth in more detail below, defendants' motion for summary judgment is granted in part and denied in part.

First, the court denies defendants' motion as to Mr. Wares' claims related to the observance of Sukkot in 1998, 1999 and 2000 because plaintiff has demonstrated a factual dispute as to whether defendants' conduct was reasonably related to legitimate penological interests. The court, however, grants summary judgment as to Mr. Wares' claim related to the observance of Sukkot in 1997 because he never requested any religious accommodations from prison officials. Second, the court denies defendants' motion for summary judgment on the grounds of qualified immunity because the summary judgment evidence, when viewed in the light most favorable to Mr. Wares, demonstrates that the defendants' conduct violated plaintiff's clearly established rights under the Free Exercise Clause of the First Amendment. Finally, the court denies defendants' motion as to Mr. Wares' requested relief because the PLRA does not prevent prisoners from recovering nominal and punitive damages in a § 1983 action.

### STATEMENT OF MATERIAL FACTS

The following facts are either uncontroverted or construed in the light most favorable to Mr. Wares, the non-moving party. *See, e.g., Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998) (setting forth summary judgment standards).

Mr. Wares is a convicted felon committed to the custody of the Kansas Department of Corrections ("KDOC"). At all times relevant to his Amended Complaint, the four named defendants were employees of the KDOC, and Mr. Wares was confined to the Hutchinson Correctional Facility ("HCF").

On December 10, 1996, Mr. Wares officially acknowledged Judaism as "his way of life."[1] On January 26, 1997, Mr. Wares

---

1. This and certain other facts contained in this section are taken from Mr. Wares' verified amended complaint. The court has relied on such information only where his factual allegations are: (1) not conclusory; (2) based on Mr. Wares' personal knowledge; and (3) would otherwise be admissible at tri-

filed a "Form B Change of Religion Request" with correctional officials, as required by Internal Management Policy and Procedure ("IMPP") 10–110. In his Form B, Mr. Wares changed his religious affiliation from "Assembly of Yahweh" to "Judaism (Jewish Study Group)." Since his conversion, Mr. Wares has attempted to comply with some of the strictest tenets of Chassidic Judaism.

Sukkot is one of the holidays observed by followers of Judaism. Sukkot is a Jewish autumn festival of double thanksgiving (one of the three Pilgrim festivals of the Old Testament) that begins on the 15th Day of Tishri (in September or October), five days after Yom Kippur, the Day of Atonement. During the Sukkot holiday, observant Jews take their meals and/or reside inside a Sukkah, which is a booth or tent comprised of a walled structure and a roof.

On September 26, 1997, defendant D.A. VanBebber, the supervisory chaplain at HCF (through September of 1999), issued a memorandum to the Captain's office discussing the Jewish holidays that observant prisoners would celebrate in October of that year. In particular, Chaplain Van-Bebber described Sukkot as the "Feast of Booths," and explained that it would begin after sundown on October 15, 1997, and end at sundown on October 17, 1997. The memorandum further informed HCF officials that Mr. Wares would take part in this observance. While the memorandum identified certain dietary and work accommodations associated with the holiday, it did not contemplate that observant prisoners would take their meals in a Sukkah booth.

If an inmate at HCF wishes to have access to a special item that has not been previously approved or routinely provided for his religious observance, IMPP 10–110 requires him to file a Form C "Request for Accommodation of Religious Practices" at least fifteen (15) days prior to the particular observance. Mr. Wares did not file a Form C or any other written request for a Sukkah booth before the 1997 holiday. Similarly, Mr. Wares did not orally request such an accommodation from any prison official. While he did not take his meals in a Sukkah, Mr. Wares participated in other Sukkot activities that year.

On September 15, 1998, Mr. Wares orally requested that Chaplain VanBebber provide HCF inmates with a Sukkah booth for the 1998 holiday. Admittedly, Mr. Wares did not submit a Form C or any other formal written request for a Sukkah, but Chaplain VanBebber had previously responded to inmates' oral requests for religious accommodations. In fact, Chaplain VanBebber did respond to Mr. Wares' oral request and discussed the issue with a Rabbi. Chaplain VanBebber ultimately denied Mr. Wares' request for a Sukkah, stating that the Rabbi informed him that Mr. Wares could comply with the requirements of Sukkot by dining with a napkin on top of his head.

Skeptical of this alternative accommodation, Mr. Wares sent an "Inmate Request to Staff Member" to Chaplain VanBebber the next day. Therein, he stated "[w]hich Rabbi told you this. What exactly did this Rabbi tell you. Tora Commands Jews to dwell in a Sukkoth Booth for 8–days, we are required to eat our meals in a Sukkoth Booth. I do not believe any Rabbi told you this." (Emphasis in original). In response, Chaplain VanBebber indicated that "Rabbi Aloof re-confirmed the information I gave to you about the napkin for the feast of booths. I talked with him in per-

---

al. *Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1019 (10th Cir.2002) (explaining that district court may treat a verified complaint as an affidavit for purposes of summary judgment if it satisfies the standards for affidavits set forth in Rule 56(e)).

son when I picked up the juice and bread for Rosh Hashanah."

On September 28, 1998, Chaplain Van-Bebber issued another memorandum to the Captain's office that set forth the Jewish holidays that would take place in October of that year. Therein, Chaplain Van-Bebber explained that Jewish inmates would observe Sukkot from October 5, through October 11, 1998; that Mr. Wares would be one of the participants; and that during the holiday, the "men may place a napkin on their head to signify eating in a booth." Mr. Wares participated in other Sukkot activities in 1998, but did not dine in a Sukkah as none was provided.

On March 8, 1999, Mr. Wares filed a grievance complaining that prison officials failed to provide him with a Sukkah in October of 1998, and that Chaplain Van-Bebber had lied regarding the acceptable substitute. HCF Warden Hannigan responded to the grievance in writing, indicating that there had been a misunderstanding between Chaplain VanBebber and Rabbi Aloof regarding the head covering, and that Chaplain VanBebber apologized for the error. The warden stated that prison officials would reevaluate the need for a Sukkah booth for the 1999 holiday.

Plaintiff Wares questions the motives of Chaplain VanBebber because the Chaplain admittedly distinguishes "real jews" (jews by birth) from "wannabe jews" (jews by conversion) such as Mr. Wares. Chaplain VanBebber has also admitted that he grew frustrated with the demands of the "wannabe Jews," and believes that the "real jews" are a lot easier to work with. Chaplain VanBebber has characterized the "wannabe jews" as mean, bitter, spiteful, resentful, and hateful.

On August 19, 1999, the defendants met with Rabbi Aloof and Rabbi Friedman to discuss several concerns regarding Jewish observances. At that meeting, the Rabbis stated that prison officials should provide the practicing inmates with a Sukkah during the holiday. Shortly after that meeting, prison officials ordered a Sukkah booth from the Aleph Institute.

In preparation for Sukkot of 1999, prison officials set up the Sukkah in the prison yard. Inmates in the Jewish callout group requested stakes and ropes to tie it down, but prison officials denied the request, claiming that the stakes posed a threat to security, even though there were wooden boards staked down with wooden stakes in the same yard where the Sukkah was located. Because the Sukkah was not tied down, it blew around the prison yard for two days, and the elements caused it to tip or blow over.

Mr. Wares filed a grievance pertaining to the prison's refusal to secure the Sukkah in 1999, which prison officials denied. In the Secretary of Corrections' response to Mr. Wares grievance, Secretary William L. Cummings explained that his office had "been advised that at the next use of this booth, staff will devise some method of further securing [the Sukkah]."

Prior to Sukkot of 2000, defendants provided a Sukkah for inmate use, but once again, refused to secure or tie it down. As a result, the Sukkah blew over for the first five days of the holiday. Thereafter, prison officials staked down the Sukkah, despite their earlier contention that this accommodation would create a security risk. While other members of the Jewish callout group used the Sukkah after prison officials staked it down, Mr. Wares refused to participate, arguing that the booth had been permanently desecrated. The same Sukkah is still in use today by the Jewish callout group for Sukkot observance at HCF.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the moving party demonstrates that there is

"no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir.2002). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Wright ex rel. Trust Co. of Kansas v. Abbott Laboratories, Inc.*, 259 F.3d 1226, 1231–32 (10th Cir.2001) (citing *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Adler*, 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Spaulding*, 279 F.3d at 904 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Adams v. American Guarantee & Liability Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir.2000) (citing *Adler*, 144 F.3d at 671).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)); *Anderson*, 477 U.S.

at 256, 106 S.Ct. 2505; *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir.2001). Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Mitchell v. City of Moore, Oklahoma*, 218 F.3d 1190, 1197–98 (10th Cir.2000) (quoting *Adler*, 144 F.3d at 671). To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibits incorporated therein." *Adams*, 233 F.3d at 1246.

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

## DISCUSSION

The defendants argue that they are entitled to summary judgment because: (1) Mr. Wares has failed to show that defendants conduct constitutes a violation of the Free Exercise Clause; (2) the doctrine of qualified immunity bars Mr. Wares' claims; and (3) the Prison Litigation Reform Act precludes Mr. Wares from recovering nominal and punitive damages. The court addresses each argument in turn.

## I. Mr. Wares' Free Exercise Claims

Mr. Wares alleges that defendants substantially interfered with his ability to exercise his right to observe Sukkot in 1997 through 2000. Defendants argue that Mr. Wares has failed to demonstrate a genuine issue of material fact as to each of these claims.

■ The First Amendment to the United States Constitution provides, in pertinent part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend. I. These protections apply to these state officials through the due process clause of the Fourteenth Amendment. *See, e.g., Gitlow v. New York,* 268 U.S. 652, 666, 45 S.Ct. 625, 69 L.Ed. 1138 (1925).

In analyzing an inmates' Free Exercise claim, the court examines whether the prison officials' conduct interfered with the prisoner's reasonable opportunity to exercise his religion. The United States Supreme Court has held that "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison," and that "inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (internal citation omitted). "In some instances, however, constitutional rights must be curtailed due to the very fact of incarceration or for valid penological reasons." *Beerheide v. Suthers,* 286 F.3d 1179, 1184 (10th Cir. 2002) (citing *O'Lone,* 482 U.S. at 348, 107 S.Ct. 2400). "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* (quoting *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)).

To balance the prisoner's constitutional rights with legitimate penal interests, the court considers:

(1) whether a rational connection exists between the prison policy regulation and a legitimate governmental interest advanced as its justification; (2) whether alternative means of exercising the right are available notwithstanding the policy or regulation; (3) what effect accommodating the exercise of the right would have on guards, other prisoners, and prison resources generally; and (4) whether ready, easy-to-implement alternatives exist that would accommodate the prisoner's rights.

*Suthers,* 286 F.3d at 1185 (citing *Turner,* 482 U.S. at 89–91, 107 S.Ct. 2254). Although *Turner* and *O'Lone* concerned the reasonableness of prison regulations, appellate courts have suggested that the same framework applies when analyzing an individual decision to deny a prisoner the ability to engage in some requested religious practice. *See, e.g., Ford v. McGinnis,* 352 F.3d 582, 595 n. 15 (2d Cir.2003).

### A. Sukkot of 1997

■ In the Pretrial Order, Mr. Wares generally alleges that defendants interfered with Sukkot observance in 1997 by failing to provide a Sukkah booth. Defendants, however, argue that summary judgment on this claim is proper because Mr. Wares never requested a Sukkah for the 1997 holiday. The court agrees.

■ The uncontroverted summary judgment evidence establishes that Mr. Wares never requested a booth for the observance of Sukkot in 1997. Moreover, Mr. Wares participated in all other Sukkot activities conducted within HCF during the observance that year. Thus, it is unclear how the defendants could have interfered with Mr. Wares' right to freely exercise his religion. As explained above, the Free Exercise clause requires that prison officials afford inmates reasonable opportunities to exercise their sincerely held religious beliefs, subject to prison restrictions rationally related to legitimate penological interests. *Hammons v. Saffle,* 348 F.3d 1250, 1254 (10th Cir.2003). Claims found-

ed upon a violation of this right, however, presuppose the existence of a prison regulation, policy, or other conduct that interferes with an inmates' ability to exercise his religious beliefs. Given that Mr. Wares made no request (formal or informal) for a Sukkah, prison officials were not even afforded the opportunity to analyze whether accommodating such a request would comport with legitimate penological interests. As such, plaintiff has failed to demonstrate the existence of a genuine issue of material fact as to this claim, and summary judgment is proper.[2] *See, e.g., Ulmann v. Anderson,* No. Civ. 02–405–JD, 2004 WL 883221, at *8 (D.N.H. April 26, 2004) (granting summary judgment on plaintiff's Religious Land Use and Institutionalized Persons Act claim where inmate never alerted defendants that his religious beliefs required him to pray with a teffilin and adhere to a kosher diet until the final days of his incarceration).

## B. Sukkot of 1998

Mr. Wares contends that prison officials violated his constitutional right to observe Sukkot in 1998 by denying his request to dine in a Sukkah booth during the holiday. Defendants argue that summary judgment is proper because Mr. Wares failed to formally request a booth in advance of the holiday, and officials allowed him to participate in all other approved activities for the observance of Sukkot.

First, defendants argue that Mr. Wares' request did not comply with HCF policy. The Department of Corrections' Internal Management Policy and Procedure 10–110 requires an inmate to file a Form C "Request for Accommodation of Religious Practices" at least fifteen days prior to an observance. Mr. Wares failed to submit a request for a Sukkah pursuant to this internal policy. Instead, Mr. Wares lodged an oral request for a religions accommodation with Chaplain VanBebber. The question on summary judgment is whether Mr. Wares' failure to comply with IMPP 10–110 is fatal to this claim.

The court finds that Mr. Wares has demonstrated a genuine issue of material fact as to whether or not his oral request was a legitimate method of requesting a religious accommodation at HCF. While his oral request for a Sukkah did not comply with IMPP10–110, Chaplain VanBebber had responded to inmates' oral requests for religious accommodations in the past. In fact, Chaplain VanBebber responded to Mr. Wares' oral request by discussing the issue with a Rabbi and deciding that inmates could dine with napkins over their head as an alternative to dining in a booth in observance of Sukkot.[3]

**2.** Defendants also argued that Mr. Wares failed to exhaust his administrative remedies for his 1997 claim. The court does not address this issue in light of its finding that Mr. Wares failed to demonstrate a genuine issue of material fact as to this claim, even assuming that it was properly exhausted.

**3.** In their statement of uncontroverted facts, defendants suggest that the Rabbi misunderstood Chaplain VanBebber's question, and that the Rabbi intended to convey to Chaplain VanBebber the fact that inmates could dine with a napkin on their heads as an alternative to wearing yarmulkes, not as an alternative to taking their meals in a Sukkah during the holiday. One might infer from this asserted fact that the defendants' conduct was inadver-

tent and did not rise to the level of an intentional constitutional violation. Defendants, however, do not develop this implicit argument in their supporting brief. Even if the court were to consider this argument, summary judgment would not be proper for two reasons. First, Mr. Wares' summary judgment evidence suggests that the "napkin on the head" alternative was not the result of a miscommunication, but instead was motivated by Chaplain VanBebber's animus towards converted Jewish inmates. To that extent, the plaintiff has successfully controverted the defendants' asserted fact. Second, even if the napkin on the head policy can be attributed to a miscommunication, the defendants failed to proffer a legitimate penological interest that was furthered by their decision. That is, the

HCF officials also provided Mr. Wares with a Sukkah in 1999, despite the fact that he never submitted a Form C request for such an accommodation. Moreover, while defendants' summary judgment evidence demonstrates that HCF has established a formal religious accommodation request procedure, the evidence fails to address the sanctions for non-compliance. A reasonable juror could infer from this evidence that despite the existence of IMPP 10–110, the course of dealings between and conduct of the parties established that inmates could properly request religious accommodations by lodging an oral request with the supervising chaplain at HCF. As such, summary judgment is not proper on this ground.

Second, the defendant argues that HCF officials provided observant inmates with special dietary items and work proscription days for Sukkot in 1998, and that Mr. Wares took part in these accommodations. Defendants, however, do not explain the significance of these facts. If they are suggesting that these accommodations should have appeased Mr. Wares (an argument that implicitly assumes that the practice of dining in a Sukkah is not a central component of the holiday), the argument fails. While the defendants have argued that Mr. Wares is not now and has never been an observant follower of Judaism, plaintiff's summary judgment evidence suggests otherwise. Mr. Wares has demonstrated that he converted to Judaism in December of 1996. Shortly thereafter, on January 26, 1998, Mr. Wares filed a Form B "Change of Religion Request," wherein he notified HCF officials that he was con-

verting to Judaism. Defendant Green admitted that Mr. Wares has been "attempting to follow some of the very strictest teachings of the Hasidic order of the Jewish faith."[4] More specifically, Mr. Wares has made clear to HCF officials that he believes the Torah requires him to take meals in a booth during Sukkot. If the defendants (by arguing that the accommodations provided to inmates in 1998 were sufficient for the observance of Sukkot) are inviting the court to question the validity or importance of Mr. Wares' sincerely held religious belief that the Torah requires him to dine in a Sukkah, we decline to do so. *Mosier*, 937 F.2d at 1526 (courts carefully avoid inquiring into the merits of particular religious beliefs in an effort to gauge sincerity, and the scrutiny of the validity of particular beliefs is largely beyond our judicial function).

If, on the other hand, defendants intend to argue that these alternative accommodations demonstrate that the burden placed on Mr. Wares' Free Exercise rights was minimal, the argument must also fail on the record before the court. As explained above, a prison officials' conduct does not offend First Amendment principles so long as it is reasonably related to a legitimate penological interest. In analyzing such questions, the Tenth Circuit has found that the mere diminishment, as opposed to the complete denial, of a prisoner's religious experience is relevant in determining whether the proffered penological interests suffice to justify the infringement. *Hammons v. Saffle*, 348 F.3d 1250, 1256 (10th Cir.2003) (citing *Ma-*

---

defendants decided to allow plaintiff to dine with a napkin over his head instead of providing him with a Sukkah for the holiday. While that decision may very well further a number of legitimate penological interests, the defendants did not proffer any of them. As such, the court cannot properly apply the *Turner* framework to determine whether they violated plaintiff's First Amendment rights.

4. In fact, defendants' argument that Mr. Wares participated in other Sukkot accommodations tends to undercut their assertion that Mr. Wares did not sincerely hold his religious beliefs.

*kin,* 183 F.3d at 1213). The problem for defendants, however, is that they did not proffer *any* penological interest that was furthered by refusing to allow Mr. Wares to eat his meals in a booth during Sukkot of 1998. This is perfectly logical given defendants' belief that Mr. Wares did not properly request a Sukkah, and therefore there was no "request" to deny. Nevertheless, plaintiffs' summary judgment evidence demonstrates that there is a genuine issue of material fact as to whether there was a proper request for a Sukkah in 1998. Had prison officials proffered, in the alternative, that their decision to embrace the "napkin on the head policy" instead of providing inmates with a Sukkah was reasonably related to a legitimate penological interest, Mr. Wares would have been required to show that the proffered justification was invalid. *Overton v. Bazzetta,* 539 U.S. 126, 132, 123 S.Ct. 2162, 156 L.Ed.2d 162 (2003) (explaining that the burden is not on the State to prove the validity of prison regulations but on the prisoner to disprove it). Because they did not, the court is not in a position to evaluate the claim under the *Turner* framework. *Ford v. McGinnis,* 352 F.3d 582, 596 (2d Cir.2003) (explaining that the court could not properly analyze whether defendants' decision to postpone the Eid ul Fitr feast was reasonably related to legitimate penological interests because defendants did not move for summary judgment on these grounds and the record was insufficient to resolve the fact and context specific dispute); *Ali v. Szabo,* 81 F.Supp.2d 447, 470 (S.D.N.Y.2000) (denying summary judgment where Sheriff did not present any evidence that the regulation restricting kufis was reasonably related to a valid penological interest); *Brown v. Johnson,* No. 98–CV–6260CJS(F), 2003 WL 360118, at *8 (W.D.N.Y. Feb. 14, 2003) (denying summary judgment where defendants failed to address how its decision to deny plaintiff therapeutic religious

alternative meals consistent with his Muslim faith was reasonably related to legitimate penological interests); *Roe v. Leis,* No. C–1–00–651, 2001 WL 1842459, at *3 (S.D.Ohio Jan. 10, 2001) (recognizing that the court would ordinarily examine whether infringement on prisoner's rights was reasonably related to legitimate penological interests, but could not do so where defendants did not offer any legitimate penological interest to justify their policy). For these reasons, the court denies defendants' motion for summary judgment as to Mr. Wares' claims founded on the 1998 observance of Sukkot.

### A. Sukkot of 1999 and 2000

█ In the Pretrial Order, Mr. Wares argues that prison officials substantially interfered with his right to observe Sukkot in 1999 and 2000 by denying his request to secure the Sukkah in the prison yard. Defendants contend that the refusal to secure the Sukkah was reasonably related to the legitimate penological objective of maintaining prison security. The court finds, however, that the evidence demonstrates a genuine issue of material fact as to whether this proffered justification was merely a pretext for interfering with Mr. Wares' right to freely exercise his religion, and that this factual dispute precludes defendants from being entitled to judgment as a matter of law.

Defendants contend that they refused to secure the Sukkah in 1999 and 2000 out of a concern that the materials required to accomplish the task could pose a threat to prison security. Neither plaintiff nor this court challenge the legitimacy of defendants' interest in maintaining prison security. *Hammons,* 348 F.3d at 1254–55 (recognizing that prison officials have a valid and legitimate interest in maintaining prison security). Instead, Mr. Wares suggests that the defendants' actions were not

actually motivated by this legitimate peno-logical interest at the time they acted. When viewed in the light most favorable to Mr. Wares, a reasonable juror could conclude that the defendants' stated justification was pretextual.

In preparation for Sukkot of 1999, inmates in the Jewish callout group requested stakes and ropes to tie down the newly acquired Sukkah. At the time of this request, there were already wooden boards secured to the ground with wooden stakes in the same yard where the prison officials placed the Sukkah. Nevertheless, defendants denied Mr. Wares' request, explaining that ropes and stakes could compromise prison security. As a result, the Sukkah blew around the prison yard for two days of Sukkot, and the elements caused it to tip or blow over. Mr. Wares filed a grievance pertaining to the prison's refusal to secure the Sukkah in 1999. In his response, William L. Cummings, Secretary of Corrections, explained that his office had "been advised that at the next use of this booth, staff will devise some method of further securing [the Sukkah booth]." Despite this assurance, defendants once again refused to secure the booth prior to Sukkot of 2000. As a result, the Sukkah blew over for the first five days of the holiday.[5] Thereafter, despite earlier representations that stakes would jeopardize prison security, prison officials staked down the Sukkah.

Mr. Wares suggests that the defendants' animus toward converted Jews, not concerns about prison security, motivated their decisions with regard to Sukkot observances. In support of this allegation, Mr. Wares relies on the above evidence and Chaplain VanBebbers' deposition, wherein he distinguishes "real jews" (jews by birth) from "wannabe jews" (jews by conversion) such as Mr. Wares. Chaplain VanBebber admitted that he grew frustrated with the demands of the "wannabe Jews," and believes that the "real jews" are a lot easier to work with. Chaplain VanBebber characterized the "wannabe jews" as mean, bitter, spiteful, resentful, and hateful. Mr. Wares contends that these attitudes are shared by other officials at HCF and are manifested in their decisions pertaining to inmate observances of Sukkot. A reasonable juror could conclude from this evidence that defendants were not motivated by prison security when they denied Mr. Wares' requests to secure the booth.[6]

While Mr. Wares has demonstrated a genuine issue of material fact as to whether or not defendants were motivated by a concern for prison security when they refused to secure the Sukkah in 1999 and 2000, the question is whether this factual

---

5. Defendants suggest that Mr. Wares was able to observe Sukkot in 1999 and 2000 because he dined in a Sukkah for part of the holiday. Mr. Wares' summary judgment evidence, however, demonstrates that his ability to dine in a Sukkah was substantially limited by defendants' refusal to secure the Sukkah to the ground. Thus, Mr. Wares has established that the burden defendants placed on him diminished the spiritual experience he otherwise could gain through Sukkot. The Tenth Circuit has recognized that "[t]his is sufficient to constitute an infringement on his right to freely exercise his religion." *Makin,* 183 F.3d at 1213. Defendants also note that Mr. Wares participated in other Sukkot activities in 1999

and 2000. As explained above, however, this does not overcome Mr. Wares' evidence demonstrating that he sincerely believed that the Torra required him to dine in a Sukkah during the holiday, and that prison officials interfered with this practice.

6. In further defense of their refusal to stake down the Sukkah, defendants argue that the booth was not designed to be staked down. The fact that the prison officials successfully secured the Sukkah by staking it to the ground during the latter part of Sukkot of 2000 demonstrates a genuine issue of material fact as to this issue.

dispute precludes defendants from being entitled to judgment as a matter of law. In other words, whether plaintiff's evidence of pretext undermines defendants' facially-valid justification for their conduct. For example, in some contexts where government action is reviewed under a rational basis analysis, the government need only show that the alleged purpose behind the state action had a conceivable rational relationship to the exercise of the state's power, and the "true" or "actual" purpose that may have motivated its proponents is irrelevant to that analysis. *See, e.g., Crider v. Bd. of County Comm'r of County of Boulder,* 246 F.3d 1285, 1289–90 (10th Cir. 2001) (explaining relevant factors in applying rational basis analysis). The court finds that such is not the case here, and that the defendants are not entitled to the deference afforded to them under the *Turner* framework if their conduct was not actually motivated by legitimate penological interests at the time they acted.

As explained earlier, in balancing Mr. Wares' constitutional rights with HCF's legitimate penal interests, the court takes into account: (1) whether a rational connection exists between the prison policy regulation and the prison's interest in safety; (2) whether alternative means of exercising the right are available; (3) what effect accommodating the request would have on the prison; and (4) whether reasonable alternatives exist that would accommodate Mr. Wares' rights. *Turner,* 482 U.S. at 89–91, 107 S.Ct. 2254. In addition to the *Turner* factors, courts have also considered whether the prison officials were actually motivated by the proffered legitimate penological interests at the time of their actions.[7]

In *Quinn v. Nix,* 983 F.2d 115 (8th Cir.1993), for example, the plaintiffs, who were inmates in the custody of the Iowa State Penitentiary, argued that defendants violated their constitutional rights by forcing them to cut their hair. At trial, the defendants argued that the hair cuts were required to quell gang-related activity. *Id.* at 117. The district court rejected the proffered explanation finding it to be pretextual. *Id.* On appeal, the prison officials insisted that they had a legitimate penological interest in curtailing gang activity. *Id.* at 118. The Eighth Circuit recognized that this was a valid interest, but explained that "[p]rison officials are not entitled to the deference described in *Turner* . . . if their actions are not actually motivated by legitimate penological interests at the time they act." *Id.* Thus, the appellate court was "not called on to decide whether prison officials have a legitimate penological interest in the length of prisoners' hair, nor . . . to decide the lengths prison officials may go in curtailing gang activity within the prison's walls." *Id.* Instead, the court was "called on to . . . review the district court's factual determination that the prison officials in this case were not motivated by the legitimate interests they assert[ed]." *Id.* With this narrowed inquiry, the Eighth Circuit affirmed the district court because there was nothing in the record to demonstrate that the district court's factual findings were clearly erroneous. *Id.* at 119.

In *Abdul Jabbar–Al Samad v. Horn,* 913 F.Supp. 373 (E.D.Pa.1995), plaintiffs challenged the constitutionality of a new prison rule that prohibited inmates from leading religious services. *Id.* at 374. The defendants explained that the new policy

---

7. Some courts analyze pretext under the first *Turner* factor, while other courts analyze pretext as an independent prerequisite to invoking the deference afforded under *Turner.* Regardless of the approach, the legal effect is the same: evidence of pretext constitutes a legitimate challenge to a defendant's claim that a regulation is reasonably related to a legitimate penological interest.

was established to prevent possible breaches in security that may arise when inmates attain power over other inmates. *Id.* Plaintiffs, however, alleged that Islam requires them to choose the Imam (the religious leader) from within their congregation, and that an outside leader would violate this tenet of Islam. *Id.* As such, plaintiffs argued that enforcement of the policy violated the Free Exercise Clause of the First Amendment. *Id.* The court denied defendants' motion to dismiss this claim, in part, because the plaintiffs were able to present a colorable claim that the security considerations mentioned by the defendants to justify the new rule were pretextual. *Id.* at 375.

In *Howard v. United States,* 864 F.Supp. 1019 (D.Colo.1994), Judge Nottingham addressed, in the context of a preliminary injunction, whether plaintiff had a right under the Free Exercise Clause to obtain time, space and implements to perform his Satanic rituals. At the evidentiary hearing, prison officials proffered several security concerns related to the items plaintiff requested to fulfill his rituals. *Id.* at 1025. The evidence, however, demonstrated that "many of the other religious groups regularly use[d] these very same-allegedly very dangerous-implements." *Id.* While recognizing that prison officials have discretion to anticipate security problems and adopt innovative solutions to the intractable problems of prison administration, the court found that the primary problem with the exercise of discretion in this case was that the policy was not content-neutral. *Id.* In the end, Judge Nottingham found that the security concerns expressed by prison officials were pretextual, and concluded that plaintiff had undermined the connection between the prison regulation and the governmental interest in security at the prison. *Id.* at 1027.

In exploring First Amendment challenges arising in comparable institutional settings, the Tenth Circuit has found that the judiciary is obligated to explore whether a defendant's proffered legitimate interest is pretextual, as demonstrated in *Axson–Flynn v. Johnson,* 356 F.3d 1277 (10th Cir.2004). In *Axson–Flynn,* the plaintiff was a student of the University of Utah's Actor Training Program. As a practicing Mormon, Ms. Axson–Flynn "refused to say the word 'fuck' or take God's name in vain during classroom acting exercises." *Id.* at 1280. Defendants, who were faculty members, told Ms. Axson–Flynn to "get over" her refusal to use those words, saying that her refusal to use such language would interfere with her growth as an actress. *Id.* Plaintiff refused to "get over" her refusal to say those words and eventually left the program. *Id.* Subsequently, she brought a civil rights action claiming that the defendants had violated her free speech and free exercise rights under the First Amendment. *Id.* The district court granted summary judgment on this claim and found that defendants were also entitled to qualified immunity. *Id.* at 1280–81.

In analyzing the free speech claim on appeal, the Tenth Circuit first found that because the compelled speech was to take place in the classroom context as part of a mandated school curriculum, it clearly bore the school's imprimatur and involved pedagogical interests. *Id.* at 1290. As such, the Tenth Circuit applied the legal framework set forth in *Hazelwood Sch. Dist. v. Kuhlmeier,* 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988), which provides that an educator's decision to restrict or compel speech is constitutional so long as it is "reasonably related to legitimate pedagogical concerns." *Axson–Flynn,* 356 F.3d at 1290. Under this framework, courts give "substantial deference" to the educator's stated pedagogical concerns. *Id.*

In *Axson–Flynn*, the defendants argued that their restriction on plaintiff's speech advanced the school's pedagogical interest in teaching acting in at least three ways: (1) it taught students how to step outside their own values and character by forcing them to assume a very foreign character and to recite offensive dialogue; (2) it taught students to preserve the integrity of the author's work; and (3) it measured true acting skills to be able convincingly to portray an offensive part. *Id.* at 1291. Although the appellate court did not second-guess the pedagogical wisdom or efficacy of these goals, it explained that "we would be abdicating our judicial duty if we failed to investigate whether the educational goal or pedagogical concern was pretextual." *Id.* at 1292–93. Thus, the court found that it could "override an educator's judgment where the proffered goal or methodology was a sham pretext for an impermissible ulterior motive." *Id.* at 1293. In applying this concept, the Tenth Circuit concluded that summary judgment was inappropriate because, when viewed in the light most favorable to Ms. Axson–Flynn, the evidence demonstrated that there was a genuine issue of material fact as to whether the defendants' justification for the script adherence requirement was truly pedagogical or whether it was a pretext for religious discrimination. *Id.*

The court believes that the Tenth Circuit would apply the same rationale to Mr. Wares' challenge, in part, because the legal framework for analyzing a free speech claim in the school-sponsored speech context is nearly identical to the framework used to analyze First Amendment challenges to prison regulations and the acts of prison officials. In both situations, an infringement on an individual's first amendment rights does not offend constitutional principles so long as it is reasonably related to a legitimate institutional concern or interest. Moreover, in both contexts, courts give substantial deference to the official's stated justification.

In light of the above analysis, the court denies defendants' motion for summary judgment because there is a genuine factual dispute as to whether defendants' proffered security justification is pretextual, which precludes defendants from being entitled to judgment as a matter of law.[8]

## II.   Qualified Immunity

Defendants contend that the doctrine of qualified immunity warrants summary judgment against the plaintiff. "Qualified immunity shields public officials from section 1983 liability if their actions did not 'violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Axson–Flynn*, 356 F.3d at 1299 (quoting *Pino v. Higgs*, 75 F.3d 1461, 1467 (10th Cir.1996)). Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985).

The purposes underlying the doctrine of qualified immunity require the court to analyze summary judgment motions invoking this doctrine differently from other summary judgment motions. *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir.2001).

---

**8.** Defendants also note that in *Searles v. Bruce, et. al.,* No. 01–3379–JTM, (D.Kan. Oct. 20, 2003), Judge Marten granted summary judgment in favor of defendants on Mr. Searles' free exercise claim, which was founded on the same events giving rise to Mr. Wares' claims in 1999 and 2000. A review of that order and summary judgment record, however, makes clear that the factual record in the two cases are materially distinguishable. Quite simply, Mr. Wares has controverted material facts that were undisputed in *Searles*, and he has raised factual disputes, such as whether the defendants' proffered justifications were pretextual, that were not at issue in *Searles*.

"When a defendant makes a qualified immunity claim on summary judgment, the plaintiff has the burden initially to make a twofold showing: First, the plaintiff must show that the defendant's alleged conduct violated the law." *Axson–Flynn*, 356 F.3d at 1299 (internal citation and quotation marks omitted). "Second, the plaintiff must show that the law was clearly established when the alleged violation occurred." *Id.* "Order is important; we must decide first whether the plaintiff has alleged a constitutional violation, and only then do we proceed to determine whether the law was clearly established." *Saucier v. Katz*, 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). "In rebutting a qualified immunity claim at the summary judgment level, a plaintiff can no longer rest on the pleadings and the court looks to the evidence before it (in the light most favorable to the plaintiff)." *Axson–Flynn*, 356 F.3d at 1299 (internal citation and quotation marks omitted). "Once the plaintiff makes this showing, the defendant bears the usual burden of a party moving for summary judgment to show that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." *Id.* at 1299–1300. "More specifically, the defendant must show that there are no material factual disputes as to whether his or her actions were objectively reasonable in light of the law and the information he or she possessed at the time." *Id.* at 1300. "At all times during this analysis, we evaluate the evidence in the light most favorable to the nonmoving party." *Id.*

## A. Did the Alleged Conduct Violate the Law

Mr. Wares has alleged that in 1998 he made a proper request for the Sukkah that prison officials denied without any justification. As to his claims in 1999 and 2000, Mr. Wares has alleged that the defendants refusal to secure the Sukkah interfered with his observance of Sukkot and that the defendants' proffered justification was pretextual. More importantly, as described above, Mr. Wares has provided evidence creating an issue of fact as to these arguments. Therefore, Mr. Wares has properly shown that the alleged conduct violated his rights under the First Amendment, thereby satisfying the first prong of the qualified immunity analysis. *See Axson–Flynn*, 356 F.3d at 1300 (finding that plaintiff satisfied first prong of qualified immunity analysis on summary judgment where she alleged facts supporting a violation of the First Amendment and provided evidence in support thereof on summary judgment).

## B. Was Mr. Wares' Constitutional Right Clearly Established at the Time of the Alleged Violation?

In its order denying defendants' motion to dismiss Mr. Wares' amended complaint, the court found that a prisoner's right to reasonable meal and dining accommodations that comply with his or her religious beliefs was clearly established at the time of the alleged misconduct. Defendants have not raised any new legal arguments or facts that would alter this conclusion. Nevertheless, recent Supreme Court and Tenth Circuit precedent warrant additional discussion of this issue.

Defendants correctly observe that if a constitutional violation has occurred, they may nevertheless be entitled to immunity if their actions did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). To be clearly established, the contours of the constitutional right "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640,

107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Id.* (internal citation omitted).

In an effort to summarize and synthesize the "clearly established law" requirement, the Supreme Court recently explained:

> [O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances. Indeed, in *Lanier,* we expressly rejected a requirement that previous cases be "fundamentally similar." Although earlier cases involving "fundamentally similar" facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding.... [T]he salient question ... is whether the state of the law [at the time of the conduct] gave respondents fair warning that their alleged treatment of [plaintiff] was unconstitutional.

*Hope v. Pelzer,* 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). Through this analysis, "*Hope* thus shifted the qualified immunity analysis from a scavenger hunt for prior cases with precisely the same facts toward the more relevant inquiry of whether the law put officials on fair notice that the described conduct was unconstitutional." *Pierce v. Gilchrist,* 359 F.3d 1279, 1298 (10th Cir.2004). Thus, the question here is whether the law put defendants on fair notice that their acts and omissions, as characterized by the plaintiff's summary judgment evidence, were unconstitutional.

■ As early as 1972, the United States Supreme Court has held that under the Free Exercise Clause, prison officials must provide inmates with a reasonable opportunity to pursue his or her religion. *Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). In 1987, the Supreme Court clarified that what constitutes a reasonable opportunity to pursue one's religion had to be evaluated with reference to legitimate penological objectives. *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987); *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987). As early as 1991, the Tenth Circuit had adopted and applied this constitutional framework in challenges to prison regulations that allegedly interfered with inmates' First Amendment rights. *See, e.g., Mosier v. Maynard,* 937 F.2d 1521, 1525 (10th Cir.1991). More pertinent to the facts here, since 1991, the Tenth Circuit has held that the First Amendment guarantees prisoners the right to reasonable dietary and meal accommodations that comport with their religious beliefs. *LaFevers v. Saffle,* 936 F.2d 1117, 1119 (10th Cir.1991). Here, Mr. Wares established a genuine issue of material fact that defendants refused to make reasonable meal and dining accommodations during Sukkot (by providing him with a Sukkah or by failing to properly secure the Sukkah), and that this decision was not founded upon legitimate penological interests. The case law discussed above gave defendants fair notice that such conduct would violate Mr. Wares' rights under the First Amendment. *See Makin v. Colo. Dep't of Corr.,* 183 F.3d 1205, 1210 n. 4 (1999) (explaining in dicta that *Turner, Shabazz, Mosier,* and *LaFevers* clearly established a prisoner's right to the reasonable opportunity to exercise his or her religion, including the right to reasonable dietary restrictions based on religious beliefs).[9] As such, Mr. Wares has satisfied

---

**9.** It is also worth noting that defendants failed to discuss or analyze any prevailing law to support their claim that Mr. Wares' right was not clearly established at the time of the alleged conduct. *Currier v. Doran,* 242 F.3d 905,

the second prong of the qualified immunity analysis.[10]

## III. The Prison Litigation Reform Act

Mr. Wares seeks to recover nominal and punitive damages stemming from the alleged constitutional violations. The defendants contend that the PLRA precludes such a recovery. The court disagrees.

Section 803(d) of the PLRA provides that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e). As such, the plain language of the statute limits the plaintiff's right to recover compensatory damages, if the only injuries are mental or emotional. *Searles v. VanBebber*, 251 F.3d 869, 876 (10th Cir.2001).

In *Searles*, however, the Tenth Circuit held that "section 1997e(e) does not bar recovery of nominal damages for violations of prisoners' rights." *Id.* at 879 (citing *Rowe v. Shake*, 196 F.3d 778, 781–82 (7th Cir.1999)). The court reasoned that such a recovery was proper given that nominal damages have traditionally served as the appropriate means of vindicating rights whose deprivation has not caused actual, provable injury, and because Congress did not attempt to alter that rule in the PLRA. *Id.* at 878–89. In fact, the Tenth Circuit explained that "the rule seems to be that an award of nominal damages is mandatory upon a finding of a constitutional violation...." *Id.* at 879.

Similarly, the *Searles* court found that punitive damages remain available, in the proper circumstances, in prisoner actions under § 1983. *Id.* at 881. In reaching this conclusion, the court found salient the fact that "Congress simply did not choose to provide a restriction on punitive damages" when it enacted the PLRA. *Id.* In light of this controlling authority, the court denies defendants motion for summary judgment on this ground.

## CONCLUSION

In the end, the court grants the defendants; motion for summary judgment on Mr. Wares' Free Exercise claim related to the observance of Sukkot in 1997 because he failed to request any accommodation from prison officials. The court denies summary judgment as to Mr. Wares' Free Exercise claims related to the observance of Sukkot in 1998 because Mr. Wares orally requested a Sukkah booth, and there is a genuine factual dispute as to whether this was a proper method of requesting accommodations. The court denies summary judgment as to Mr. Wares' Free Exercise claims related to the observance of Sukkot in 1999 and 2000 because he has demonstrated a genuine issue of material fact as to whether the defendants' stated justification for their conduct was merely a pretext for infringing upon his Free Exercise rights.

Moreover, defendants are not entitled to summary judgment on qualified immunity grounds (as to these surviving claims) be-

923 (10th Cir.2001) (qualified immunity will not be granted if government defendants fail to make reasonable applications of the prevailing law to their own circumstances).

10. Defendants continue to argue that there is no clearly established constitutional right to be provided a staked-down Sukkot booth. As explained in its order denying defendants' motion to dismiss, the defendants character-

ize Mr. Wares' rights too narrowly. As the Supreme Court and Tenth Circuit have clarified, the plaintiff need not identify prior cases with precisely the same facts as alleged here. Instead, Mr. Wares must show that the established law put officials on fair notice that the conduct (as described by the plaintiff) was unconstitutional. As explained in this section, the court finds that he has satisfied this burden.

cause Mr. Wares has shown that his right to reasonable dining and meal accommodations that comport with his religious practices was clearly established at the time of the asserted violations, and defendants have failed to show that there are no material factual disputes as to whether their actions were objectively reasonable in light of the law and the information they possessed at the time.

Finally, the court denies summary judgment as to Mr. Wares' requests for nominal and punitive damages because the Tenth Circuit has found that the PLRA does not preclude such recoveries.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' motion for summary judgment (Doc. 142) is **granted in part and denied in part.**